HOFFMAN, *Appellant*, v. NOLTE *et al.*

Division Two, March 5, 1895.

1. **Husband and Wife:** LAND ACQUIRED DURING COVERTURE: PRESUMPTION. Land acquired during coverture the title to which is taken in the name of the husband and wife jointly, is presumed, in the absence of evidence to the contrary, to have been purchased with the means of the husband.

2. ———: VOLUNTARY CONVEYANCE: PRESUMPTION. A voluntary conveyance by a debtor to his wife is, as against prior creditors, presumptively fraudulent.

3. ———: ———: ———: BURDEN OF PROOF. To render a voluntary conveyance by a husband to his wife valid as against prior creditors, the burden of proof is on the grantee to show that the debtor retained sufficient property to pay his debts.

4. ———: ———: FRAUDULENT CONVEYANCES. The evidence in this case examined and *held* to show that a conveyance by a husband through another to himself and wife jointly was fraudulent as to his creditors.

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

REVERSED AND REMANDED.

*Carlisle & Ottofy* for appellant.

(1) A creditor is not necessarily the holder of a debt merely, as that term is generally understood; for one having a legal right to damages capable of judicial enforcement is a creditor within the meaning of the statutes and law upon the subject of fraudulent conveyances. 8 Am. & Eng. Encyclopedia of Law, p. 750, and cases there cited under note 1. (2) Where a man creates a joint tenancy between himself and son, or takes title to property in the joint name of himself and wife, the conveyance being voluntary, if there is no other property to satisfy a judgment creditor, a court of equity will declare the conveyance fraudulent both as to antecedent and subsequent creditors and decree satisfaction of the judgment out of the property. Roberts on Fraud. Conv., *19 and following; *Stileman v. Ashdown*, 2 Atk. 478; *Christ's Hospital v. Budgin*, 2 Vern. 683. And, even though thirty-seven years elapse between the conveyance and the judgment. *Stileman v. Ashdown, Ibid.* (3) If a debtor is in embarrassed or doubtful circumstances, and makes a voluntary conveyance, and is afterward unable to meet his debts owing at the time of the conveyance, in the

ordinary course prescribed by law for their collection, or is reduced to that situation that an execution against him would be unavailing, such conveyance is void as to those debts and the property conveyed is subject to their payment. *Potter v. McDowell*, 31 Mo. 73; *Bucks v. Moore*, 36 Mo. App. 535; *State to use v. Laurie*, 1 Mo. App. 378; *Lionberger v. Baker*, 88 Mo. 453; *Walsh v. Ketchum*, 84 Mo. 431; *Jordan v. Buschmeyer*, 97 Mo. 97; *Bohannon v. Combs*, 79 Mo. 312; *Oberneier v. Tressler*, 19 Mo. App. 522. *First.* Condition to pay debts in the ordinary course does not mean, as persons carrying on trade usually do. *Potter v. Mc-Dowell*, 31 Mo. 73. *Second.* And this is the rule, although the property reserved may have been deemed originally adequate to that purpose. Bump on Fraud. Conv. [3 Ed.], p. 285. *Third.* It is only where he had ample means at the time of the conveyance that it will be upheld against creditors. *Walsh v. Ketchum*, 84 Mo. 431; *Warner v. Dove*, 33 Md. 587. *Fourth.* In considering the question of ample means, even though solvent, the extent of his means and the nature and situation of his property must be considered; it must be such as in conveniently accessible to creditors, and as may be reached and subjected by process of law without his consent, without delay, difficulty or expense; it is not sufficient that he may have in some form or another enough property or money in his pocket to pay all his debts. *Eddy v. Baldwin*, 32 Mo. 374; Bump on Fraud. Conv. [3 Ed.], pp. 288, 289; *Warner v. Dove*, 33 Md. 587. *Fifth.* The imputation of fraud is repelled only where a person of great wealth conveys a small property, or his debts bear a very small proportion to his actual means. 1 Story's Eq. Juris. [13 Ed.], sec. 355. (4) "It is not necessary to prove an actual intent to delay, hinder or defraud creditors. Intent is an emotion or operation of the

mind, and can be shown only by acts or declarations."
Bump on Fraud. Conv. [3 Ed.], p. 270, cases, notes
1 and 2; *Cooper v. Standley*, 40 Mo. App. 144; *Doug-
lass v. Cissna*, 17 Mo. App. 64; Wait on Fraud. Conv.
[2 Ed.], sec. 208, p. 299; *Deering v. Collins*, 38 Mo.
App. 73; *Snyder v. Free*, 114 Mo. 362.   (5) It is not
necessary to show that one is insolvent, at the time of
making a voluntary conveyance in order to render it
void as to existing creditors.  *Potter v. McDowell*, 31
Mo. 73; *State to use v. Laurie*, 1 Mo. App. 378;
Bump on Fraud. Conv. [3 Ed.], p. 289; *Hastings
v. Crossland*, 13 Mo. App. 597.  However honest the
transaction, title only passes subject to the just de-
mands of creditors, both prior and subsequent.  R.
S. 1889, sec. 5170; *Gabriel v. Mullen*, 111 Mo. 125.
(6) Where property is acquired in name of wife during
coverture, the presumption of law is that it was paid
for by the husband; the burden is on her to show that
she acquired it with her separate means; in the absence
of such evidence there is a violent presumption that it
was acquired with his means.  *Sloan v. Terry*, 78 Mo.
625; *Jordan v. Buschmeyer*, 79 Mo. 79; *Seitz v. Mitch-
ell*, 94 U. S. 589; *McFerran v. Kinney*, 22 Mo. App.
554; *Patton v. Bragg*, 113 Mo. 601; *Bucks v. Moore*, 36
Mo. App. 536.   (7) To uphold the conveyance it must
be made both upon a good consideration and *bona fide*.
1 Story's Eq. Juris. [13 Ed.], sec. 353.  Natural love
and affection as a consideration can not be supported
as a general rule against the rights of existing cred-
itors.   Wait on Fraud. Conv. [2 Ed.], sec. 210, p. 301;
*Snyder v. Free*, 114 Mo. 360.  (8) Where debtor's estate
is insolvent no further proceeding are required to lay
a foundation for equitable relief against his fraudulent
grantee.  *Lyons v. Murray*, 95 Mo. 23.  "As such
transfer is void at law, the property becomes, at the
death of the transferor, legal—and not merely equit

able—assets for creditors." May on Fraud. Conv. [1 Ed.], p. 69. And the conveyance will be disturbed so far as is necessary to satisfy their claims. May on Fraud. Conv. [1 Ed.], 68, 69, 316, 464.

*Stone & Slevin* for respondents.

(1) To constitute a fraudulent conveyance, there must, as a rule, be a concurrence of three elements; that is to say, there must be a creditor to be defrauded, a debtor intending to defraud, and a conveyance of property out of which the creditor could have realized his claim, or some portion thereof. 8 Am. and Eng. Encyclopedia of Law, p. 749; *O'Conner v. Ward*, 60 Miss. 1036; *Hoyt v. Godfrey*, 88 N. Y. 669. (2) A voluntary deed to a member of the family made when the grantor was perfectly solvent is good and valid as against existing creditors. *Walsh v. Ketchum*, 84 Mo. 427; *Davis v. Kenedy*, 105 Ill. 300; *Herring v. Richards*, 3 Fed. Rep. 439; *Curry v. Loyd*, 22 Fed. Rep. 258; *Carr v. Bruge*, 81 N. Y. 584. (3) A voluntary settlement may now be made by a party indebted at the time, provided that ample available assets are left out of settlement to meet those debts whether the debts are actually then payable or not. May on Fraud. Conv. p. 50; Bump on Fraud. Conv., p. 278. (4) It is settled that mere indebtedness alone is not sufficient to render a voluntary conveyance void, if the donor has ample means left to pay his debts. Bump on Fraud. Conv., p. 279; *Eddy v. Baldwin*, 32 Mo. 369; *Moritz v. Hoffman*, 35 Ill. 553. (5) As to subsequent creditor actual fraud must be proved. *Mittelberg v. Harrison*, 11 Mo. App. 136; *Payne v. Stanton*, 59 Mo. 158; *Mittelberg v. Harrison*, 90 Mo. 444. (6) If a creditor having demands accruing partly before, and partly after a conveyance by his debtor, which he would impeach on

the ground of fraud, blends them in one suit, and, having received judgment, extends his execution on the land, he can come in only in the character of a subsequent creditor. *Quimby v. Dill*, 40 Me. 528; *Reed v. Woodman*, 4 Me. 400; *Moritz v. Hoffman*, 35 Ill. 558; Bump on Fraud. Conv., p. 509. (7) A voluntary conveyance is not *per se* fraudulent as against creditors prior or subsequent, but the *bona fides* is a question of fact under all the circumstances attending its execution. *Lane v. Kingsbury* 11 Mo. 402; *Lloyd v. Fulton*, 91 U. S. 485; *Hinde's Lessee v. Longworth*, 11 Wheat. 213; *Walsh v. Ketchum*, 84 Mo. 427. (8) "Such a conveyance is fraudulent only when it necessarily delays, hinders or defrauds them." Bump on Fraud. Conv., pp. 275, 276; *Potter v. McDonald*, 31 Mo. 62; *Patten v. Casey*, 57 Mo. 118. (9) "The rule is that fraud must be proved and can not be presumed, and, if the facts shown are all consistent with an honest purpose, honesty in the transaction should be inferred." *Robinson v. Dryden*, 118 Mo. 534. (10) Where it is not shown that the debtor is in embarrassed circumstances, or largely indebted, or that a suit against him would be unavailing, or that he is unable to meet his debts in the ordinary course prescribed by law for their collection, a voluntary conveyance will not be set aside as fraudulent and void. *Dougherty v. Harsel,* 91 Mo. 161.

GANTT, P. J.—This is an action in equity to divest the title from defendant Anna Nolte in certain real estate in the city of St. Louis, and to set aside a certain deed of conveyance thereto by Joseph Nolte on the ground that it was executed in fraud of creditors. The tract contains twenty-one and thirty-nine hundredths acres. The substance of the petition is as follows:

Plaintiff states that on the fifteenth day of March, A. D. 1892, he recovered a judgment in the circuit court of

the city of St. Louis, state of Missouri, against Joseph Nolte, now deceased, for the sum of $1,679.60 as appears by the certified transcript of the proceedings in said cause herewith filed and marked "Exhibit A;" that execution issued thereon against the property of the said Joseph Nolte, directed to the sheriff of said city and state, which said execution has been returned by the said sheriff wholly unsatisfied; and said judgment is wholly unpaid and unsatisfied and the whole thereof, with interest from said fifteenth day of March, 1892, is still due plaintiff from the said Joseph Nolte, deceased.

Plaintiff further states that said deceased, Joseph Nolte, with a view and with the intent to hinder, delay and defraud his creditors, and among others this plaintiff, did on the twenty-third day of October, 1883, execute a certain conveyance of that date, in which the defendant, Anna Nolte, his wife, joined and relinquished her dower, whereby he assigned to one John C. Gmeiner, now deceased, certain property situated in the city of St. Louis and state of Missouri and described as follows, to wit:    A tract of land in United States survey 1913 (here follows a description of the land by metes and bounds), containing twenty-one and thirty-nine hundredths acres, which said conveyance is recorded in book 714 at page 394; that upon the execution and delivery of said deed no possession was ever taken of said property by the said Gmeiner but that on the same day and date and immediately thereafter the said Joseph Nolte, deceased, caused another conveyance of said above described property to be made by the said Gmeiner to himself, said Joseph Nolte, and the defendant Anna Nolte, which said conveyance is of record in the recorder's office of the city of St. Louis, Missouri, in book 709, at page 523; that the said Joseph Nolte, deceased, had and retained possession of said property

and that the said Gmeiner never in any manner took possession of the same or entered thereon.

Plaintiff states that in truth no consideration passed from the said Gmeiner to said Joseph Nolte, deceased, and Anna Nolte his wife, one of these defendants, nor did any consideration pass from the said deceased Joseph Nolte and Anna Nolte, one of these defendants, to the said Gmeiner in the subsequent reconveyance to them aforesaid, but that both of said conveyances were voluntary ones and without consideration, and made, as above stated, for the purpose of hindering, delaying and defrauding the creditors of said Joseph Nolte, deceased, of which purpose the said Anna Nolte, defendant herein, was fully cognizant at the time such conveyance was made.

Plaintiff further states that said Johanna M. Werkmann, one of the said defendants, is the sole heir of said John C. Gmeiner and that said defendant John J. Werkmann is her husband; that the said Joseph Nolte departed this life on the twenty-first day of June, 1892, and that said defendant Anna Nolte is his widow and sole legatee under his will duly probated in the probate court of said city and state on the twenty-fifth day of June, 1892, and recorded in book V, at page 665, and that she was, in pursuance of said will, on said date, appointed the executrix of the estate of the said Joseph Nolte, deceased, without bond; that defendant Nicholas Nolte and Joseph Nolte are the surviving children and only heirs of the said Joseph Nolte, deceased.

Plaintiff further states that on the eleventh day of July, 1892, the said defendant, Anna Nolte, as executrix, filed in the said probate court an inventory and appraisement of the entire and complete estate of the said Joseph Nolte, deceased, and that the same was duly appraised at the sum of $169.55 and that the same is exempt from liability for the debts of the deceased.

Plaintiff states that said Joseph Nolte, deceased, left no other property out of which the judgment and execution aforesaid can be satisfied in whole or in part, and that unless the property so fraudulently assigned to defendant, Anna Nolte, can be reached and applied to the payment of the said judgment the same must remain wholly unpaid.

Wherefore plaintiff prays for a decree that both of the said conveyances aforesaid be adjudged fraudulent and void as against plaintiff; that the same be set aside and for naught held; that the property therein mentioned be ordered to be sold for the satisfaction of said judgment of plaintiff, and that defendants be in the meantime enjoined and restrained from disposing of said property or paying out any of the proceeds thereof, or in anywise interfering therewith, and for such other and further relief as to the court shall seem meet and just.

All the defendants, except Johanna and John J. Werkmann, were duly served with process. Those served filed an answer containing a general denial of the averments of the petition.

Joseph Nolte and his wife Anna, German immigrants, landed in New York in the month of May, 1868; his sister, Mrs. Anna Sieler, sent him the money to enable them and his brother Henry to reach St. Louis. He commenced life here as a driver; finally about 1878 he drifted into the business of truck farming, or gardening; about August 15, 1878, Joseph Nolte hired Edward Hoffman, the plaintiff, then a boy, as a farm hand, who continued in his employ until August 15, 1886. About October 1, 1879, Joseph Nolte bought the Carondelet farm for $2,400, taking a deed in the joint names of himself and wife, and gave a deed of trust on the property on the same day for $1,000. He collected the proceeds of the business, hired the em-

ployees; briefly, it was his business in all respects, his wife attending to the household duties. October 17, 1881, he paid off the deed of trust for $1,000, and August 18, 1883, he sold the Carondelet farm for $3,050 cash. September 22, 1883, he bought the Natural Bridge road property, described in the petition, taking the deed in his name, the consideration being $6,417; he paid $3,417 cash and assumed a deed of trust for $3,000 on this and other property. On October 23, 1883, Joseph Nolte and his wife Anna, one of the defendants, transferred the property described in the petition to John C. Gmeiner for a purported consideration of $6,417, which was recorded on the same day at 1:08 P. M. On the same day, October 23, 1883, Gmeiner conveyed the property to Joseph Nolte and Anna Nolte, his wife, for a pretended consideration of $6,417, they to assume a certain deed of trust. June 10, 1890, the deed of trust for $3,000 on the property described in the petition was released of record. At the time of his purchase of the property in question he stated that he had enough money to pay the deed of trust and that he had his money at the Christian Brothers. It appears that he had money on deposit there at various times and in various amounts from 1878 to 1884.

Judge Alexander Davis, a neighbor of Nolte's, testified that about the time that Nolte acquired the property in question, shortly after, he had litigation about a windmill and he said "it was giving him a great deal of trouble, and that the property was not his now, or was not going to be his." He also had lawsuits in the criminal court.

Conrad Oxman, a gardener who knew Nolte for sixteen years, testified that about the time of the transfer by Nolte to his wife Nolte told him that "he was

turning everything over to his wife; * * * that there might come trouble some time."

John Brugge, a neighbor, who knew Nolte for fifteen years, testified that about the time he bought the property in question he said "that he gave it over to his wife on account of, if he had any trouble that he did not have nothing, that he fix it all right. * * * It was about the time he got a lawsuit with the lightning rod company; at the time he conveyed the property he had about five lawsuits."

Anna C. Nolte, defendant, had given her deposition in the case January 16, 1893, which was read in evidence, and is as follows: "I bought the property in question, I paid for the place $6,300; I got that money in the old country, where I worked for it; I first bought a place for $2,400 in Carondelet, I paid for it; we sold it and got $3,000, and we used that to buy the present place, the balance is still due on it; in 1883 or 1884, when I bought the property, my husband had no means, except that money; that was money I earned in the old country; I brought $2,400 from the old country, the amount the land cost; we did not pay all cash for the property, we paid $1,000 and the balance I could not get; *I had misplaced it and could not find it*; I found the money again, I do not remember how long after I purchased the property that I found it; I do not have to tell what part of the house I found the money; I do not know; I do not think I paid over the money as soon as I found it; I had borrowed the money for a year; I had the money from the man without security or a deed of trust for the balance; *don't remember the name of the man from whom I borrowed the money without security;* it was not the party from whom I bought the property; we bought the Carondelet land together; I paid for it, it was my money.   Owe $3,000 on property in question, all the money that was paid was the $3,000 I got for

the other place; in 1883, and before, my husband did not make very much money; I don't know whether he had any money on deposit anywhere or not at that time. *My husband had the deed to the property in question rewritten in order to give me half the property;* the taxes were always paid with my money; the property was on the assessor's books in my name until within the last few months, and the tax bills were made out solely in my name; I can not recollect whether Gmeiner paid me anything for the property."

Nicholas Nolte, defendant, deposition as follows: "When the property in question was bought I was twenty years old; I run the farm at Carondelet; my father did not have very much to do with it; he did not live there, mother ran the Natural Bridge road farm; all father had was two head of horses; it is a fact that I testified to before in the case that father looked after the business, and mother the household, that was the way of it; I guess I did testify before that father owned everything on the place; I don't know how it was on the Natural Bridge road; father bought the Carondelet property in 1879, I run the place and was then sixteen years old."

August Gehner testified that the deeds from Nolte to Gmeiner, and Gmeiner to Nolte and wife, to the property in question, sought to be set aside in this action, were without consideration and made by Nolte in order to get the title into the joint names of himself and wife.

The plaintiff brought suit against Joseph Nolte, July 17, 1891, for services rendered from August 15, 1878, to August 15, 1886, and March 15, 1892, recovered a judgment for $1,679.60. An unsuccessful motion for a new trial was made, execution issued, and returned *nulla bona.* An affidavit for an appeal was filed by him June 4, 1892, but no appeal bond was given.

Nolte made his will June 11, 1892, whereby he devised all his estate to his widow. He died about June 21, 1892. His widow qualified as executrix, and the inventory filed by her shows property appraised at the sum of $169.55. This she afterwards secured under an order of no process by the probate court. The property in question is now valued at about $32,300.

The statute against fraudulent conveyances, section 5170, Revised Statutes, 1889, declares void as against creditors, both prior and subsequent, every conveyance made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands.

The plaintiff in this case was a boy when he went to work for Joseph Nolte, on the fifteenth of August, 1878. He continued to labor for Joseph Nolte without interruption until August 15, 1886. He received nothing for his labor, save his board and lodging during all that time, and was compelled to sue for his wages. By the verdict of a jury and the judgment of the circuit court of St. Louis the justice of his claim has become unalterably settled. It remains to be seen whether the courts can afford him satisfaction of his judgment.

By his judgment it was affirmatively established that he was a creditor of Joseph Nolte for services rendered from August 15, 1878, to October 1, 1879, when Nolte first acquired title to the Carondelet farm, which was jointly conveyed to him and his wife.

That his farm was purchased by Nolte out of his own earnings admits of little doubt; but if any doubt existed, the testimony of Mrs. Nolte dispels it. Her attempt to claim that she brought $2,400 with her from Germany is utterly discredited and confuted by the testimony. No court is called upon to believe a story so unreasonable and so self-contradictory. The evidence shows that she and her husband were German immi-

grants; that, when they landed in New York in 1868, his sister, Mrs. Sieler, sent him $25 to enable them to come to St. Louis. For ten years her husband engaged in driving a hack and truck gardening, and finally bought the Carondelet place for $2,400, and could only pay $1,400 down, and gave a deed of trust for $1,000. And yet Mrs. Nolte would have us believe that for ten years she had had in her possession $2,400 she had brought from the old country. When asked why she did not pay the whole purchase price when she had sufficient money on hand, she not only contradicts the record, which shows her husband paid $1,400 down, by saying they only paid $1,000, but she asserts "the balance *I could not get, I had misplaced it and could not find it.* I found the money again. I do not remember how long after I purchased the property that I found it. I do not have to tell what part of the house I found the money. I do not know. I do not think I paid over the money as soon as I found it. I had borrowed the money for a year. I had the money from a man without security, or a deed of trust for the balance. *I don't remember the name of the man from whom I borrowed the money without security.*" In short she says she bought the Carondelet farm in 1879 and paid cash for it by borrowing $1,400 of a friend who required no security, and whose name, notwithstanding his extreme kindness and confidence, she can not recall. The record shows this farm was bought October 1, 1879, for $2,400. $1,400 was paid down and $1,000 secured by mortgage on the property.

The evidence further shows that in 1883 Joseph Nolte and wife sold and conveyed the Carondelet place for $3,000. On October 1, 1883, Annie Wise and others conveyed to Joseph Nolte the property in suit for $6,417. When Joseph Nolte acquired this title, the evidence shows that he had sufficient money deposited

with the Christian brothers to pay for it. He, however, did not pay the whole purchase price. He paid $3,417 down and gave a deed of trust for $3,000, which he afterward paid. At the time of acquiring the sole title to this land, he was indebted to plaintiff for five years' wages, for which he afterward recovered judgment.

About this time he became involved in various lawsuits and concluded to have the title conveyed to himself and wife by entireties. John C. Gmeiner was used as a convenient conduit. Nolte and wife conveyed the land to Gmeiner and Gmeiner immediately reconveyed to them. No consideration moved from or to Gmeiner for either deed. Joseph Nolte continued to be the sole apparent owner. By this deed Joseph Nolte intended to secure the whole title to said tract to his wife in case of his death. That it was a purely voluntary conveyance on his part there can be little doubt.

But it is urged that in conveying this estate jointly to his wife, Joseph Nolte was simply placing her where she would have been, had they not sold the Carondelet property. It is apparent that she furnished no other consideration for said deed. But the Carondelet property was acquired during coverture and, in the absence of any pleading or evidence that it, or some portion of it, was purchased with the separate means of Mrs. Nolte, the presumption is that it was purchased with the property of her husband. *Patton v. Bragg*, 113 Mo. 595; *Sloan v. Torry*, 78 Mo. 623.

Such has always been the rule of the common law, and the rule continues, though statutes have modified the doctrine that gave the husband absolutely the personal property of his wife in possession, and the right to reduce into his possession and ownership all her choses in action. *Seitz v. Mitchell*, 94 U. S. 561; *Gamber v. Gamber*, 18 Pa. St. 363; *Walker v. Reamy*, 36

Pa. St. 410; *Ryder v. Hulse*, 24 N. Y. 372; *Connors v. Connors*, 4 Wis. 112; *Edson v. Hayden*, 20 Wis. 682; *Duncan v. Roselle*, 15 Iowa, 501; *Cramer v. Reford*, 17 N. J. Eq. 367.

It devolved, then, upon Mrs. Nolte to rebut the presumption that the Carondelet property was purchased solely by her husband's funds.

It is needless to pause at any length to show that the presumption was not rebutted by her most unreasonable, contradictory and unsatisfactory, if not absolutely incredible story.

It follows, then, that as the Carondelet property was Joseph Nolte's, and its proceeds went into the Natural Bridge property, the deed by him to Gmeiner, and from Gmeiner to his wife, was purely voluntary, and, as to plaintiff, who was a prior creditor, it was presumptively fraudulent in law. *Patton v. Bragg*, 113 Mo. 601; *Jordan v. Buschmeyer*, 97 Mo. 94.

We are met at this point with a plea that Joseph Nolte was entirely solvent, and this provision for his wife, made at a time when he was perfectly solvent, is good and valid even against existing creditors.

In *Snyder v. Free*, 114 Mo. 360, *loc. cit.* 369, this court approved the statement extracted from the various decisions by Mr. Bump in his work on Fraudulent Conveyances [3 Ed.], pp. 276 and 277, to this effect: "The burden of proof rests upon the donee to establish the circumstances which will repel the presumption of a fraudulent intent. The conveyance stands condemned as fraudulent unless the facts which may give it validity are proved by him. If no evidence is given to show that the donor had ample means to meet his liabilities, then the transfer must be deemed void as against creditors."

In *Walsh v. Ketchum*, 84 Mo. 427, the prior cases in this state were reviewed and the rule announced in

*Patten v. Casey*, 57 Mo. 118, was approved to this effect: "That a voluntary conveyance made by a debtor in embarrassment or doubtful circumstances, *without ample means* outside of the particular property conveyed, for the satisfaction of his then existing debts, though made without any specific intent to defraud, is fraudulent in law as to all who were creditors at the time of the execution of the conveyance."

In *Walsh v. Ketchum* it appeared that Ketchum was neither in embarrassed or doubtful circumstances, but was perfectly solvent; that he was worth $50,000 over his debts and he had conveyed a piece of property worth $7,000 on which was an incumbrance of $4,000, in trust for his wife. It was held that this conveyance was not fraudulent.

In this case Joseph Nolte conveyed to his wife by this deed an estate by the entirety in the only visible property he had in the world. When he died no administration was had on his estate, because the inventory only amounted to $169.55, and this his widow received. The money he had at the Christian Brothers was inaccessible. It was not deposited in any of the banking institutions of the city and no creditor would have thought of finding money on deposit in a church school. The preponderance of evidence, however, tends to show this went to the satisfaction of the $3,000 deed of trust. If not, no sufficient explanation is given of it.

But it is now said that his interest in the land in suit was vendible after the estate by the entireties was created; and so it was. *Hall v. Stephens*, 65 Mo. 670. But plaintiff obtained his judgment March 15, 1892. Motions for new trial and in arrest were filed March 16, and overruled April 18, 1892. Nolte died on June 21, 1892. By his death this valuable property all passed to his widow by the right of survivorship and,

as was said by Lord HARDWICKE in *Stileman v. Ash-down*, 2 Atkyns, 477–480, "unless we let the plaintiff in upon these estates (this land) *the plaintiff has no possibility of being paid.*"

The solvency required by an unbroken line of decisions in this state, essential to protect a voluntary gift, "consists not only in the present ability of the debtor to pay his debts, but in such a condition of his means that payment can be enforced by process of law." *Eddy v. Baldwin*, 32 Mo. 369; *State ex rel. v. Koontz*, 83 Mo. 323.

Outside of the specific property conveyed to his wife this record discloses no property belonging to Joseph Nolte, and, considering his age, the mere expectancy in this land fell far short of that ample provision he was required to make for his debts, before he could generously donate his estate to his wife. Moreover it ignores the fact that $3,000 was placed in this land by him after the deed was made against which plaintiff has a clear equity.

The plaintiff has a judgment for work and labor performed on this tract for Joseph Nolte, the apparent owner, and his wife the defendant herein. Doubtless his work has aided in enhancing its value. The owner gave it away without making any provisions for the laborer. If the conveyance should stand, Joseph Nolte's widow and sons take an estate worth $30,000 and plaintiff's judgment is utterly valueless. By the very act of conveying this property to his wife he rendered his estate incapable of meeting the just demand of plaintiff. His wife became the universal donee of all he had and the result was inevitable. It necessarily was a fraud on plaintiff. The statute was designed to frustrate schemes of this kind. *Snyder v. Free*, 114 Mo. 360; *Claflin v. Mess*, 30 N. J. Eq. 211.

But we need not rest our judgment upon pre-

sumptions which the law indulges to prevent parties placing their property out of the reach of their creditors. There is ample evidence that Joseph Nolte was a litigious man; that he had as many as five lawsuits on his hands at one time and he then confided to his two friends and fellow countrymen, Oxman and Brugge, that he had conveyed it all to his wife so that "if he had any trouble, that he did not have nothing; that he fix it all right." Brugge says at that time he had a lawsuit with a lightning-rod company. Had about five lawsuits.

This is not a case of conflict in the evidence, in which we would feel disposed to yield to the judgment of the circuit court. The evidence for plaintiff stands practically unimpeached, and we have no hesitancy in pronouncing that it establishes not merely constructive fraud, but a clearly established purpose to convey his property so as to hinder and delay his creditors, and such being the case it is within our jurisdiction to so adjudge it on appeal, notwithstanding the judgment of the circuit court. The judgment of the circuit court is reversed and the cause remanded with directions to enter a decree for plaintiff setting aside said deeds as to plaintiff as prayed in his petition. SHERWOOD and BURGESS, JJ., concur.