238 F.2d 881
 Milton D. HARTMAN, George Hartman, Jane I. Hartman, Hazel K. Hartman and Milton D. Hartman, as Executor of the Will of Pauline Morehead, Appellants,
v.
Fred J. LAUCHLI, Trustee of Hartman Corporation of America, Appellee.
 No. 15465.
 United States Court of Appeals Eighth Circuit.
 November 2, 1956.
 Rehearing Denied January 4, 1957.
 
 COPYRIGHT MATERIAL OMITTED William J. Becker, Clayton, Mo., for appellants.
 Kenneth Teasdale, St. Louis, Mo. (Cobbs, Armstrong, Teasdale & Roos, and Charles E. Dapron, Jr., St. Louis, Mo., were on the brief), for appellee.
 Before JOHNSEN, VAN OOSTERHOUT and WHITTAKER, Circuit Judges.
 WHITTAKER, Circuit Judge.
 
 
 1
 Appellee, as Trustee in Bankruptcy of Hartman Corporation of America, brought this action, in seven counts, against appellants (and two others, Charles A. Hartman and Milton Hartman Corporation, who were voluntarily dismissed from the case by appellee at the beginning of the trial) to recover large sums of money alleged to have been fraudulently paid by the bankrupt to appellants between September 2, 1943 and January 13, 1946.
 
 
 2
 Counts 2, 3 and 4 of the complaint were voluntarily dismissed by appellee before trial, and Counts 1, 5, 6 and 7 were tried before the Court without a jury. Counts 1 and 5 were decided against appellee, who has not appealed, and those counts need not be further noticed, but the Court found against appellants on Counts 6 and 7 of the complaint and entered judgment accordingly, from which they have appealed.
 
 
 3
 Introductorily, we observe that Hartman Corporation of America, was created under the laws of Missouri in late August, 1943; that Milton D. Hartman was its president and owned substantially all its stock, but his grandfather, Charles A. Hartman, was its vice-president, and his father, George Hartman, was its secretary and treasurer, and owned five shares of its stock; that Milton and George were two of the three directors of the company, and that on September 1, 1943, the company commenced its original business which was to manufacture airplane engine starters for, and under a contract with, the government.
 
 
 4
 That on the same day, September 1, 1943, by formal written articles, a partnership was created between Milton, Jane, George, Hazel and Charles Hartman and Pauline Morehead — the latter five being the wife, father, mother, grandfather and grandmother, respectively, of Milton Hartman — for the stated purpose of acting as manufacturers' agents in selling all types of electrical products, under the firm name of American Electrical Products Company, as general partners.
 
 
 5
 That the Hartman Corporation's very profitable contract with the government came to an end near the close of 1944, and it, thereafter, engaged in making lawnmowers, battery chargers and steam cleaners, which business proved unprofitable, and, on December 2, 1947, by which time it had accumulated known creditors with claims aggregating more than $425,000 dollars, a proceeding in reorganization under Chapter 10 of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., was instituted in the Federal District Court at St. Louis, but that proceeding proved abortive, partly because the government soon afterward assessed against the corporation a deficiency in income taxes for the years 1943, 1944 and 1945, aggregating, with penalties and interest, the sum of $731,638.59, and, on July 16, 1948, the corporation was adjudged bankrupt, and appellee was elected Trustee, and, pursuant to order of the Referee so directing, he brought this suit.
 
 
 6
 Count 6 of the complaint charged, in essence, that appellants, as partners doing business as American Electrical Products Company, conspired to and did, between September, 1943 and July, 1944, divert monies of Hartman Corporation to themselves by contracting with Wind King Electric Manufacturing Co. of Merrill, Iowa, for a large number of generators designed for and required by the Hartman Corporation in assembling its airplane engine starters, at a cost of about $62 per unit, and reselling them to Hartman Corporation at $135 per unit, resulting in a diversion of Hartman Corporation's monies to themselves in the amount of $254,000; and by causing Hartman Corporation to purchase various spare generator parts from themselves at prices far in excess of their cost therefor, resulting in diversion of Hartman Corporation's monies to themselves in the further sum of $50,000; that the transactions were not at arm's length, and were without consideration, and were fraudulent against the creditors of the bankrupt, particularly under Section 110, sub. e(1) of Title 11 U.S.C.A., and what is now Section 428.020 of the Revised Statutes of Missouri, 1949, V.A.M.S., and that the payments were made with intent to hinder, delay and defraud creditors; and that the transactions were in violation of the fiduciary duties and obligations of Milton D. Hartman and George Hartman, as officers and directors of the bankrupt. A joint judgment for recovery of the stated sums, with interest, was accordingly prayed.
 
 
 7
 Count 7 of the complaint charged, in essence, that on the 2nd day of February, 1945, the Hartman Corporation, at the instance of Milton D. Hartman, was caused to enter into an agreement with appellants, as partners doing business as American Electrical Products Company, whereby appellants agreed to furnish to the Hartman Corporation "such industrial and scientific research as may be reasonably required" for the sum of $5,000 per month plus "all costs and expenses reasonably incurred in the performance of the contract"; that the contract was terminated January 31, 1946, but that during the period of its existence the bankrupt was caused to pay $60,000 for such alleged services and $44,515.39 as alleged expenses, to American, but that, in fact, no such services were rendered and no such expenses were incurred, by American, and that the payments, aggregating $104,515.39, were without consideration and were fraudulent against the creditors of the bankrupt, particularly under Section 110, sub. e(1) of Title 11 U.S.C.A. and what is now Section 428.020 of the Revised Statutes of Missouri, 1949, V.A.M.S., and that said monies were caused to be paid to American by the bankrupt with the intent to hinder, delay and defraud its creditors. A joint judgment for recovery of the stated sum with interest was accordingly prayed.
 
 
 8
 At the trial, appellee put on evidence to sustain the averments of Count 6 of his complaint which was not controverted by any evidence offered by appellants, tending to show that between September 2, 1943 and February 5, 1945 American caused 3,677 generators and a large number of spare parts to be made and shipped by Wind King to Hartman Corporation, and that American charged to, and was paid by, Hartman Corporation therefor $307,641.76 more than it paid Wind King for those products, and that American had only a token office of about 100 square feet in the Hartman Corporation plant, and only one employee, a bookkeeper, and that none of these products were ever in its physical possession but were shipped directly by Wind King to Hartman Corporation, and that American did little more than place the orders with Wind King and to invoice, and collect from, Hartman Corporation, and then pay a portion of those proceeds to Wind King in payment of its invoices for the goods, and that, in this way, Hartman Corporation was caused to pay to American $568,974.66 ($496,395 for generators and $72,579.66 for parts) for products for which the partnership paid Wind King $261,332.90 ($243,600 for generators and $17,732.90 for parts), resulting in a profit to appellants, partners doing business as American, in the amount of $307,641.76; and that, except for the intervention of American, Hartman Corporation could have purchased these generators and parts directly from Wind King at the identical price which American paid Wind King for them, or for $307,641.76 less than Hartman Corporation actually paid to American for those goods.
 
 
 9
 Likewise, appellee put on evidence to sustain the averments of Count 7 of his complaint, which was not controverted by any evidence offered by appellants, tending to show that about the time Hartman Corporation ceased making airplane engine starters for the government, and, hence, ceased to have any need for generators and parts, Hartman Corporation was caused, on February 2, 1945, to enter into a contract with American to pay it $5,000 per month for "industrial and scientific research" services and all expenses reasonably incurred by American in performance of the contract; that the contract was terminated January 13, 1946, but in the interim Hartman Corporation made 12 monthly payments of $5,000 each to American for purported industrial and scientific research services, plus $49,761.29 as purported expenses, or a total of $109,761.29, when, in fact, none of the partners of American was either an engineer or a scientist, and they employed no one who was, and they did not have any plant, factory, laboratory, warehouse or shop, and did not render any engineering, scientific, industrial or other kind of service whatever to Hartman Corporation, and, hence, they did not, in fact, incur any expense in performance of the contract, and that the payments, aggregating $109,761.29, made by Hartman Corporation to American were wholly fictitious.
 
 
 10
 There was also uncontroverted evidence that the partners, doing business as American, received from the partnership, in addition to return of their original capital contributions, the following sums: Milton D. Hartman $113,149.04, Jane I. Hartman $49,383.58, George Hartman $95,133.21, Hazel Hartman $73,114.52, Charles Hartman $66,881.08 and Pauline Morehead $28,076.97, totaling $425,738.40 and, thus approximating the amount of "profits" made in their dealings with Hartman Corporation.
 
 
 11
 The only evidence offered by appellants at the trial related to a claimed setoff, which the Court disallowed. The evidence and finding on that point will later be separately discussed.
 
 
 12
 The Court, in his formal findings of fact, found all the foregoing to be facts, and also found that the files in the Hartman Corporation bankruptcy proceeding, pending in his court, and of which he took judicial notice, disclosed that there were provable claims against the bankrupt in excess of $1,300,000 including the claim of the United States "for taxes, and the penalty and interest thereon, for the years 1943, 1944 and 1945, the very period in which the corporation was caused to pay the partnership $417,403.05, and was being caused to receive nothing, or virtually nothing, in return."
 
 
 13
 We have to say, and it is convenient to say now, that, although appellants argue to the contrary, careful analysis of the record discloses that there was, and we find there was, substantial evidence — most of it uncontradicted — to sustain each of the foregoing findings of fact.
 
 
 14
 But do those findings of the Court support his conclusions and the judgment? The Court concluded (1) that all of the aforesaid payments by the bankrupt to the partners (appellants) were made for the purpose and with the intent to hinder, delay or defraud creditors of the bankrupt, and had that effect, and that those payments were fraudulent and void under Section 428.020 of the Missouri Statutes, and hence are void as to the Trustee under Section 110, sub. e(1) of Title 11 U.S.C.A., and (2) that Milton and George Hartman had breached their fiduciary duty to deal fairly with the bankrupt and not to make a profit for themselves at its expense, and (3) that as directors and officers of Hartman Corporation, they are liable to the Trustee under Section 351.350 of the Missouri Statutes because they caused the bankrupt to pay $307,641.76 more than the fair value of the generators and parts, and $109,761.29 more than the fair value of the alleged industrial and scientific research services and expenses.
 
 
 15
 Upon these findings and conclusions the Court entered judgment in favor of appellee and against appellants — on Count 6 for $307,641.76 with interest at 6% from December 20, 1948, aggregating $421,629.21, and on Count 7 for $109,761.29 plus interest of 6% from December 20, 1948, aggregating $150,372.97 — in the total amount of $572,002.18.
 
 
 16
 After unsuccessful motions for relief from, and to vacate, the judgment, and for a new trial, appellants have appealed to this Court.
 
 
 17
 It will be noted at the outset that there is neither evidence nor finding that the bankrupt had a single creditor during the period from September 1, 1943 to January 13, 1946 — the period during which the questioned payments were made — unless it can be said that the government's income tax claim, assessed in 1948 "for the years 1943, 1944 and 1945", in the total amount, including penalties and interest, of $731,638.59, gave it the status of a creditor of the bankrupt in those years, because no other claim outstanding against the bankrupt at the time of the bankruptcy antedated May 29, 1946, and appellee concedes "that, so far as the `transfers' in suit are concerned, these accounts payable would be termed as `subsequent creditors'"; nor is there any evidence or finding that the bankrupt was insolvent in those years and at the time it made the questioned payments.
 
 
 18
 Appellants contend that the government's income tax claim assessed in 1948, though as a deficiency for the years 1943, 1944 and 1945, cannot be held to have given it the status of a creditor of the bankrupt in those years, and that hence, there is no evidence that the bankrupt had a single creditor during the period of the questioned payments, and that the burden was upon appellee to show the existence of at least one creditor whose claim was outstanding at the time of the payments and which remained unsatisfied at the time of the adjudication, and that, having failed to do so, appellee did not prove an essential element of his case, and that the evidence and findings do not support the judgment; and they assert, further, that even if it be held that the government's tax claim gave it the status of a creditor of the bankrupt in the years 1943, 1944 and 1945, and therefore during the period of the questioned payments, there is no evidence or finding that the bankrupt was insolvent at the time of those payments, or was rendered insolvent by those payments, and that, again, appellee has failed to prove an essential element of his case, and that the evidence and findings do not support the judgment.
 
 
 19
 Section 110, sub. e(1), Title 11 U.S. C.A., provides:
 
 
 20
 "A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor."
 
 
 21
 Section 428.020 of the Missouri Statutes, 1949, V.A.M.S., provides, in essence, that:
 
 
 22
 "Every conveyance * * * of any estate or interest in lands, or in goods and chattels, or in things in action, * * * made or contrived with the intent to hinder, delay or defraud creditors of their lawful * * * debts or demands * * * shall be from henceforth deemed and taken, as against said creditors * * *, prior and subsequent, to be clearly and utterly void."
 
 
 23
 Though this statute was enacted in substantially the same terms October 1, 1804, 1 Terr.Laws, p. 19, Sec. 19, and has ever since continued as a statute of Missouri, it has since been many times held by the courts of Missouri that a transfer, though made voluntarily and without consideration, is not fraudulent or void against creditors if the transferor, at the time of the transfer, had no creditors. The Supreme Court of Missouri collected the cases and treated exhaustively with this question in the case of Coleman v. Hagey, 252 Mo. 102, at page 136, 158 S.W. 829, at page 840, and held, upon the support of many cited cases, that the assets of a corporation, while it is solvent, are not impressed with any trust for present or future creditors, and that: "While solvent and a going concern it holds its property like a natural person, free from the touch of general creditors; and that it may dispose of same as the judgment or wisdom of its management dictates, subject only to the provisions of its charter and those other restraints upon the conveyance of property which the law imposes as well upon individuals as upon corporations. This court and our Courts of Appeals have repeatedly recognized the correctness of this modern doctrine, and the reasoning in support of same will be found upon reference to the Missouri cases here cited, thus avoiding lengthy quotations from same", (citing many Missouri cases). With this fortification, the court got down to the precise question here, saying, 252 Mo. at page 133, 158 S.W. at page 838:
 
 
 24
 "A trustee in bankruptcy in prosecuting a suit to judgment must prove the facts essential under the state law, since to hold otherwise would be but to decide that he could recover without proof of his right to do so (Miller v. [New Orleans] Acid & Fertilizer Co., 211 U.S. 496, 29 S. Ct. 176, 53 L.Ed. 300, 21 Am.Bankr. Rep. 416); and in a proceeding to set aside a conveyance or divest title it is necessary to prove that the claim upon which the suit is based existed prior to the time of the conveyance. Stone v. Myers, 9 Minn. 303. It is no concern of the trustee's what the defendants may have done or did with their property prior to the time claimants became creditors; as to them, defendants may have given away their property or conveyed it away (with no matter what purpose), and only those creditors who became such before the fraudulent conveyance have a right to complain; hence the necessity of showing the existence of the claim prior to the conveyance. Bloom v. Moy, 43 Minn. 397, 45 N.W. 715."
 
 
 25
 In accord are the more recent cases of Riggs v. Price, 277 Mo. 333, 210 S.W. 420, Dickey v. Thompson, 323 Mo. 107, 18 S.W.2d 388.
 
 
 26
 We think it is clear, under the Missouri law, that if the bankrupt had no creditors at the time of the questioned payments, those payments cannot be held to have been made in fraud of creditors — certainly not when the complainant has not produced evidence showing that the bankrupt, at the time of those payments, was insolvent, or was rendered so by those payments, and "harbored the fraudulent intent to become indebted and secrete his property as against future creditors". Stierlin v. Teschemacher, 333 Mo. 1208, 1222, 64 S.W.2d 647, 654, 91 A.L.R. 121.
 
 
 27
 The resulting and threshold question then is: Was the government, because of its income tax claim assessed in 1948 as a deficiency for the years 1943, 1944 and 1945, a creditor of the bankrupt in those years? We believe it was (beginning at March 15, 1944), and that its claim constitutes a debt provable in bankruptcy. We believe this because, by the terms of the Internal Revenue Code income tax liability matures on the day the return is required to be filed, and the correct amount of the tax liability becomes due at that time, regardless of when the deficiency assessment may be made, Sec. 6151, 1954 Code, 26 U.S.C.A. § 6151; Vol. 4, C.C.H., 1956, para. 5231, p. 44078, et seq. Such was also the prior law. And by the regulations "Interest at the rate of 6% per annum shall be paid on any unpaid amount of tax from the last date prescribed for payment of the tax (determined without regard to any extension of time for payment) to the date on which payment is received" (Regs. 301.6601-1; para. 5507, C.C.H., 1956), and limitations run from the date the correct amount of tax should have been paid, and not from the date of the assessment, Sec. 6501, 1954 Code, 26 U.S. C.A. § 6501; Regs. 301.6501 (a-1), and a deficiency "is the difference between the amount of tax, if any, which is paid on the due date, and the correct liability for any taxable year" (Para. 5316.01, C.C.H., 1956).
 
 
 28
 This Court has several times held that a subsequently levied tax constitutes a claim as of the time it matured under the law, and must be considered in determining the question of solvency of the taxpayer at that time. Scott v. Commissioner, 8 Cir., 117 F.2d 36, 38; United States v. Armstrong, 8 Cir., 26 F.2d 227; Updike v. United States, 8 Cir., 8 F.2d 913. See also Commissioner of Internal Revenue v. Keller, 7 Cir., 59 F.2d 499, and United States v. Seyler, D.C.W.D. Pa., 142 F.Supp. 408, 410.
 
 
 29
 On the basis of these authorities we hold that the government's tax claim for the year 1943 became a liability of the bankrupt on March 15, 1944, the date when the return for that year was required to be filed, and that its tax claim for the year 1944 became a liability on March 15, 1945, and that its tax claim for 1945 became a liability on March 15, 1946, and we hold that these claims, as they so matured, constituted provable debts in bankruptcy, Ingels v. Boteler, 9 Cir., 100 F.2d 915, 918; In re Mercury Engineering, D.C.S.D.Cal., 68 F.Supp. 376, 382; Sec. 797, Remington on Bankruptcy, 4th Ed.
 
 
 30
 But this does not eliminate the difficulty. While it considerably simplifies the issue under Count 7, it only starts the chain of complexities affecting the issues under Count 6, because, though the government became a creditor of the bankrupt, in respect of its tax claim for the year 1943, on March 15, 1944, it was not a creditor during that portion of the time when the payments, questioned in Count 6, were being made from September 1, 1943 to March 15, 1944, and as respects those payments, the government is, at most, a subsequent creditor; and it is not shown in the evidence nor found by the Court how much of the money, that is embraced in the judgment on Count 6, was paid by the bankrupt to appellants in that period and how much was paid afterward. The evidence and findings, pertaining to Count 6, show only the total amount paid by the bankrupt to appellants in the whole period from September 1, 1943 to February 5, 1945. Yet the judgment on Count 6 includes the amounts paid by the bankrupt to petitioners in the whole period of from September 1, 1943 to February 5, 1945, and, hence, includes the payments made before the government became a creditor on March 15, 1944, and there is no way in the world for us or for anyone else to tell from this record how much of the questioned payments, embraced in the judgment on Count 6, was paid by the bankrupt to appellants before the government became a creditor.
 
 
 31
 It is therefore clear that appellee failed to adduce proof sufficient to support the judgment on Count 6, unless some presumption comes to his aid in the circumstances. He contends precisely so — that a presumption did come to his aid and that it filled the gaps in his evidence, under the circumstances shown. He says that when he put on evidence showing that the payments were voluntarily made, without consideration, the law of Missouri created a presumption that the payments were fraudulent not only as to existing creditors, but as to subsequent creditors as well, and that he, thus, with the aid of that presumption, made a prima facie case, and that the burden of going forward with the evidence to explain and show otherwise — even that the bankrupt was solvent at the time of the payments, and was not rendered insolvent by them and was not at the time harboring a fraudulent intent to become indebted and to secrete its property from the reach of future creditors — passed to and rested upon appellants, and that they failed to adduce any evidence in discharge of that burden and that the presumption of fraud thus stands.
 
 
 32
 It is true that many Missouri cases hold that a voluntary conveyance without consideration is presumed to be fraudulent, as to existing creditors, and, when such is shown, plaintiff makes a prima facie case, and the burden of going forward with the evidence to show that the conveyance was not fraudulent — including the fact that the grantor was not insolvent at the time of the conveyance, nor rendered so by it — passes to and rests upon the party who received the conveyance, Patten v. Casey, 57 Mo. 118; Walsh v. Ketchum, 84 Mo. 427; Snyder v. Free, 114 Mo. 360, 369, 21 S.W. 847; Hoffman v. Nolte, 127 Mo. 120, 135, 29 S.W. 1006; Clark v. Thias, 173 Mo. 628, 652, 73 S.W. 616; May v. Gibler, 319 Mo. 672, 4 S.W.2d 769; Dickey v. Thompson 323 Mo. 107, 108, 18 S.W.2d 388; American National Bank v. Thornburrow & Stone, 109 Mo. App. 639, 643, 83 S.W. 771; Updegraff v. Theaker, 57 Mo.App. 45, 47; Gilson v. Carroll, 231 Mo.App. 395, 397, 97 S.W. 2d 146. This Court, too, so held, in a Missouri appeal, in Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 488, 489.
 
 
 33
 But, as stated and emphasized, this presumption arises, and this shift in the burden of going forward with the evidence occurs, only as respects creditors whose claims were in existence at the time of the transfer. The presumption does not arise, and the shift in the burden of going forward with the evidence does not occur, as respects "subsequent creditors". This is definitely held by the Supreme Court of Missouri in Coleman v. Hagey, 252 Mo. 102, 145, 158 S.W. 829, 843, in this language:
 
 
 34
 "The trustee represents in this proceeding only subsequent creditors; i. e., those who extended credit to the corporation or whose claims were created against it long after the transaction by defendants of which plaintiff complains. As a general rule subsequent creditors cannot attack a transfer unless they can show that the fraudulent intent was intended towards them; or, as is held by the Supreme Court of Alabama: `A subsequent creditor of a corporation cannot complain of a conveyance or transfer of the corporate property unless such conveyance or transfer was made with the intent to hinder, delay, and defraud subsequent creditors, and "that the conveyance or transfer" had such operation and effect; and in such case the burden is upon the subsequent creditor seeking the relief to allege and prove such fraud.' Wilson v. Stevens, 129 Ala. 630, 29 So. 678. There is nothing in the case, under consideration, to relieve the trustee who represents the creditors, from the requirements of the rule stated."
 
 
 35
 Again, in May v. Gibler, 319 Mo. 672, 678, 4 S.W.2d 769, 772, the Supreme Court of Missouri said:
 
 
 36
 "* * * We have held in a long line of cases that proof of fraud as to existing creditors does not necessarily render a deed void as to subsequent creditors and that actual fraud as to them must be pleaded and proved. Coleman v. Hagey, 252 Mo. 102, 158 S.W. 829; Johnson v. Murphy, 180 Mo. 597, 79 S.W. 909; Davidson v. Dockery, 179 Mo. 687, 78 S.W. 624."
 
 
 37
 To the same effect is Stierlin v. Teschemacher, 333 Mo. 1208, 1222, 64 S.W.2d 647, 654, 91 A.L.R. 121. This is a wellsettled rule in Missouri.
 
 
 38
 The government's earliest tax claim, the one for the year 1943, did not accrue until March 15, 1944, and the government was, hence, a subsequent creditor as respects the payments made between September 1, 1943 and March 15, 1944, and, under the Missouri law, the burden of proving that the payments made by the bankrupt to appellants, in that period, were fraudulent against subsequent creditors was upon appellee, and inasmuch as he has failed to show that the bankrupt was insolvent at the time those payments were made, or that they rendered it insolvent, and that when those payments were made "the debtor harbored the fraudulent intent to become indebted and to secrete his property as against future creditors," Stierlin case, 333 Mo. at page 1222, 64 S.W. 2d at page 654, it follows that appellee has failed to sustain the burden which the law cast upon him of showing that the payments, made in the period mentioned, were fraudulent as to subsequent creditors.
 
 
 39
 As to appellee's further claim, in support of his judgment on Count 6, that appellants Milton and George Hartman, as officers and directors of the bankrupt, breached their fiduciary duties to deal fairly with it and not to make a profit for themselves at its expense, it is sufficient to say, on the basis of Coleman v. Hagey, supra, and other like Missouri cases cited, that inasmuch as the bankrupt is not shown to have had any creditors in the period from September 1, 1943 to March 15, 1944, Milton and George Hartman, who owned the bankrupt company, were, in that period, free to do with its assets as they liked and "it is no concern of the trustee's what the defendants may have done or did with their property prior to the time claimant [the government here] became a creditor", Coleman case, 252 Mo. at page 133, 158 S.W. at page 838, and, as earlier stated, it is impossible to tell from this record what part of the payments, embraced in the judgment on Count 6, were made by the bankrupt to appellants before the government became a creditor on March 15, 1944, and what part was paid afterwards.
 
 
 40
 As to appellee's still further claim, in support of his judgment on Count 6, that Milton and George Hartman, as directors and officers of the bankrupt, knowingly purchased for the bankrupt the generators and parts involved in Count 6 and caused it to pay therefor more than the fair value thereof to the bankrupt and thus became "* * * jointly and severally liable for the debts of the corporation to an amount equal to the difference between the purchase price of said property bought and such fair value thereof * * *" under Section 351.350 of the Missouri Statutes, 1949, V.A.M.S. — from which the quoted language is taken — it is sufficient to say that we believe the phrase "liable for the debts of the corporation", as used in the statute, means debts of the corporation existing at the time of such purchases; and there is no showing that there were any "debts of the corporation" prior to the accrual of the government's 1943 tax claim on March 15, 1944, and there is no showing as to how much of the "purchases" accrued before, and how much after, that date.
 
 
 41
 For all the foregoing reasons, we are clear that, as respects Count 6, appellee has failed to prove the above-mentioned essential elements of his case, and that neither the evidence nor the findings sustain the judgment rendered on that Count, and it follows that the judgment on Count 6 must be reversed, and that Count must be remanded for a new trial.
 
 
 42
 But upon Count 7 we have exactly the converse. Upon that count it appears, and has been found by the trial court, that, after the date upon which we have held the government first became a creditor of the bankrupt — March 15, 1944 —, the bankrupt, between the dates of February 2, 1945 and January 13, 1946, paid to appellants, without consideration, and with intent to hinder, delay or defraud creditors, the sum of $109,761.29. When those payments were made the government was, as stated, an existing creditor, as respects its tax claim for 1943, and, under the Missouri cases earlier cited, when appellee put on evidence, as he did, tending to show that the payments complained of in Count 7 were voluntarily made without consideration, the presumption of fraudulence of those payments, as against the existing creditor — whose claim remains unpaid —, came to his aid and with that presumption, he made a prima facie case, and the burden of going forward with the evidence — to explain that the bankrupt was not insolvent when the payments assailed in Count 7 were made, and that those payments did not render it insolvent, and that those payments were not intended to and did not operate to hinder, delay or defraud the existing creditor (the government — upon its income tax claim for the year 1943, that matured March 15, 1944) — passed to and devolved upon appellants, and inasmuch as they offered no evidence to rebut the prima facie case thus made by appellee with the aid of the presumption mentioned, it follows that the presumption of fraudulence stands, and that, with it, there was evidentiary support for the finding of the trial court that those payments were made for the purpose and with the intent to hinder, delay or defraud creditors of the bankrupt, and that finding supports the judgment on Count 7, and, therefore, the judgment upon Count 7 must be affirmed.
 
 
 43
 Appellants set up in their answer that, after the bankrupt became financially embarrassed in 1947, they paid the sum of $206,796.66 from their own funds to Mississippi Valley Trust Company in reduction of the bankrupt's indebtedness to that bank, and they claimed, in consequence, an offset in that amount against any claims that the trustee might be able to establish against them in this suit.
 
 
 44
 We have traced these setoff transactions with care and are satisfied that there was no merit in these claims of offset, as the trial court held, because at the time those payments were made by appellants a number of appellants, and various corporations which they owned, had overdrawn their accounts with, and were indebted to, the bankrupt company in large amounts, and, upon appellants' own direction and action, as the trial court found, they received credit to their accounts on the books of the bankrupt company for all sums which they paid to the bank on the indebtedness of the bankrupt, and thus they simply paid and extinguished their overdrafts or debts to the bankrupt company, and, hence, the bankrupt owes them nothing.
 
 
 45
 It follows that the judgment upon Count 7 must be, and it is hereby, affirmed, but the judgment upon Count 6 must be, and it is hereby, reversed, and the cause, as to Count 6, is remanded for a new trial.
 
 
 46
 Affirmed as to Count 7.
 
 
 47
 Reversed and remanded as to Count 6.
 
 
 48
 On Rehearing.
 
 
 49
 Appellants have moved for a rehearing, and for leave to file exhibits in support of their motion for rehearing, and appellee has filed a petition for modification of our opinion, or for rehearing as to Count VI.
 
 
 50
 Appellants' motion for leave to file proffered exhibits (consisting merely of documents which would have been entitled to be noticed by the District Court) in support of their motion for rehearing is granted, and said exhibits are ordered filed.
 
 
 51
 Appellants' motion for rehearing is based on the contention that the statements in our opinion, saying that the Government's deficiency income tax claim against The Hartman Corporation for the years 1943, 1944 and 1945 had been "assessed", in 1948, is not supported by the Record. While the District Court did not, in his findings, use the word "assessed", he did find that those claims had been filed in The Hartman Company bankruptcy proceeding, pending before him and of which he took judicial knowledge, and that they were both "provable claims" and "priority claims", which strongly implied that they had been "assessed"; and, moreover, the first exhibit, filed here by appellants in support of their present motion for rehearing, confirms this finding by expressly and repeatedly saying that those claims had been so "assessed" by the Treasury Department. Appellants' motion is therefore without merit and is denied.
 
 
 52
 But it does appear, quite conclusively, from the exhibits filed by appellants in support of their motion for rehearing, that The Hartman Corporation was, in the years in question, on a fiscal year accounting and tax reporting basis, and that its fiscal year ended April 30, instead of on a calendar basis, as we inferred from the District Court's finding that these taxes were "for the years 1943, 1944 and 1945", and, therefore, its income tax return for the fiscal year ended April 30, 1944 was not required to be filed, and the correct amount of tax did not become due, under Section 56(a) of the Internal Revenue Code of 1939, Section 56(a), Title 26, U.S.C., until July 15, 1944, and, to correct that error, we hereby modify our opinion by substituting "July 15" for "March 15" wherever used in our opinion.
 
 
 53
 We have considered appellee's petition for modification of our opinion or for rehearing, as to Count VI, and are of the opinion that it, in the circumstances and condition of this Record, is without merit and should be, and it is hereby, denied.