UNITED STATES of America, Plaintiff,

v.

William THOMASSEN, Joan Thomassen, Elmer Thomassen, Leo W. Thomassen, O'Neill Production Credit Association, Harold S. Fried and Ruth Fried, Defendants.

Civ. No. 78–0–241.

United States District Court, D. Nebraska.

Jan. 16, 1985.

David Moynihan, Daniel, Ross, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Jeanene Moenckmeier, St. Louis, Mo., for defendants Elmer, Joan and William Thomassen.

James T. Gleason, Omaha, Neb., for defendant Leo Thomassen.

Richard J. Spethman, Omaha, Neb., for defendants Harold and Ruth Fried.

RICHARD E. ROBINSON, Senior District Judge.

## I. INTRODUCTION

The United States of America brings this action under 26 U.S.C. Sections 7401–7403, 28 U.S.C. Sections 1340 and 1345 to reduce certain tax liabilities to judgment, to set aside an allegedly fraudulent conveyance of real property, and to foreclose federal tax liens against such property. Jurisdiction of this Court is proper pursuant to 28 U.S.C. Section 1396 and the above-mentioned provisions. This Memorandum constitutes the Court's findings of facts and conclusions of law in accordance with Fed. R.Civ.P. 52(a).

This case was tried to the Court on August 2 and 3, 1984. The parties were given 45 days at the close of the trial to submit post-trial briefs and all briefs have been received. Plaintiff United States of America (Government) presented the testimony of defendants William Thomassen, Leo Thomassen, and Ruth Fried. Defendant William Thomassen presented the testimony of co-defendants Joan Thomassen, Elmer Thomassen, and Joseph G. Krane, a California public accountant.

## II. FACTS

An understanding of who the parties to this action are and their relationship to each other is necessary to follow the events from which this case evolved. The related defendants in this action are William Thomassen, Elmer and Joan Thomassen, and Leo and Tommie [1] Thomassen. Elmer and Joan Thomassen are husband and wife, and William is their son. Elmer and Leo Thomassen are brothers. Harold and Ruth Fried (husband and wife) are holders of a valid purchase money mortgage on the real estate in question and are not related to the other defendants. Leo Thomassen and O'Neill Production Credit Association (O'Neill P.C.A.) are defendants in this action due to Leo's ownership of an undivided one-half interest in the real estate in question and O'Neill P.C.A.'s first mortgage on Leo's interest in the real estate.

On December 7, 1968, Leo Thomassen and his late wife, Tommie, and Elmer and Joan Thomassen jointly purchased undivided one-half interests in a parcel of land from Harold and Ruth Fried. The undivided one-half interests that both parties received in the real estate, which is the subject of this suit, are described as follows:

An undivided one-half (½) interest in: The Southwest Quarter of the Southwest Quarter (SW¼ SW¼) of Section Twelve (12), The West Half (W½), and the West

---

**1.** Tommie Thomassen died after this action was commenced, and Leo Thomassen subsequently remarried. A suggestion of death was filed (Filing No. 16) and Leo Thomassen's present wife, Margaret, was made a party to this action prior to the start of the trial.

Half of the Southeast Quarter (W½ SE¼) and the Southeast Quarter of the Southeast Quarter (SE¼ SE¼) of Section Thirteen (13), and the North Half of the Northeast Quarter (N½ NE¼), and the Southeast Quarter of the Northeast Quarter (SE¼ NE¼), and the Northeast Quarter of the Northwest Quarter (NE¼ NW¼), and the Southeast Quarter (SE¼) of Section Twenty-four (24) and the Northeast Quarter (NE¼) of Section Twenty-five (25), Township Thirty-three (33), Range Fourteen (14), and Lots Three (3) and Four (4) in Section Nineteen (19), and the West Half of the Northwest Quarter (W½ of NW¼) of Section Thirty (30), Township Thirty-three (33), Range Thirteen (13), Holt County, Nebraska. [hereinafter the Holt County property].

Subsequently, on December 8, 1968, Leo and Elmer executed a document entitled "AGREEMENT" which provided that if one party failed to pay his share of the mortgage or one-half of the taxes for two years, the other party had the right to make those payments and the delinquent/non-paying party would lose all interest in the property. Defendants' Exhibit 104; T11:9–20. Whether this document is a valid binding agreement between the parties has not been raised as an issue in this case and, therefore, will not be considered by the Court. Actions by at least one of the parties apparently were based on the assumption that the agreement was valid and binding, however, the Court does not comment on its validity, but merely notes its existence for future reference.

Harold and Ruth Fried hold a valid purchase money mortgage on the Holt County property, dated December 7, 1968. This mortgage is prior and superior to any lien the Government may have on this property through William, Elmer, and/or Joan Thomassen. (Pretrial Order, Filing # 85, par. 9). At the request of the Court, following the close of the trial, the Friends' counsel submitted to the Court by letter dated August 23, 1984, the balance due on the mortgage held by Mr. and Mrs. Fried. The Friends indicated that to the best of their knowledge and estimate, the balance due on the Holt County property mortgage, as of August 15, 1984, was $79,563.76 with interest, and $47,900.00 without interest. All parties agreed to the submission of the mortgage balance in this manner. T141:2–142:15.

Elmer and Joan Thomassen incurred substantial tax liabilities for income taxes due during the years 1964 through 1971. On June 2, 1975, the United States Tax Court found that the total amount of the deficiencies against Elmer and Joan for the years 1964–1971 amounted to $317,087.72, not including interest. (Pretrial Order, Filing No. 85, p. 5). Assessments of income tax, penalties, and interest for the years 1964–1971 were made by a delegate of the Secretary of the Treasury and the Internal Revenue Service pursuant to the Tax Court's determination against Elmer and Joan Thomassen, and notices were timely sent to the parties on October 13 and 17, 1975.[2]

The Thomassens failed to satisfy their assessed tax liability and approximately

---

2. The assessments made against Elmer and Joan and the corresponding years are as follows: Assessments of income tax, penalties, and interest made by the Secretary of the Treasury on October 13, 1975, against the taxpayer-defendants Elmer H. Thomassen and Joan Thomassen:

| Year | Income Tax | Penalty Section 6653(a) | Interest |
|---|---|---|---|
| 1964 | $19,553.39 | $ 977.67 | $12,478.16 |
| 1965 | 29,614.49 | 1,480.72 | 17,122.24 |
| 1967 | 28,342.24 | 1,417.11 | 12,985.60 |
| 1968 | 37,089.00 | 1,854.00 | 14,767.77 |
| 1969 | 49,484.00 | 2,474.00 | 16,734.06 |
| 1970 | 56,970.00 | 2,849.49 | 15,847.41 |

Assessments of taxes, penalties and interest against Elmer Thomassen, made by the Internal Revenue Service on October 18, 1975:

| Year | Income Tax | Penalty Sec. 6651(a) | Penalty Sec. 6653(a) | Penalty Sec. 6654 | Interest |
|---|---|---|---|---|---|
| 1966 | $12,859.00 | $3,214.75 | $642.95 | | $6,663.17 |
| 1971 | 19,841.00 | 4,960.00 | 992.05 | $634.91 | 4,328.73 |

Assessment of taxes, penalties and interest made by the Internal Revenue Service on October 18, 1975 (against Joan Thomassen):

| Year | Income Tax | Penalty Sec. 6651(a) | Penalty Sec. 6653(a) | Penalty Sec. 6654 | Interest |
|---|---|---|---|---|---|
| 1966 | $12,453.10 | $3,113.27 | $622.65 | | $6,452.86 |
| 1971 | 19,255.80 | 4,813.95 | 962.79 | $616.19 | 4,201.06 |

(Pretrial Order, Filing No. 85).

two years later, on October 18, 1977, notices of federal tax liens were filed in the official records of Holt County, Nebraska, against Elmer and Joan Thomassen in the amount of $322,041.35. Plaintiff's Exhibit 4 and 5. However, on April 5, 1972, Elmer and Joan Thomassen conveyed their interest in the Holt County property by warranty deed to their son, William, for the stated consideration of "one dollar and love and affection." The Government subsequently recorded a notice of federal tax lien in the amount of $322,041.35 on the official records of Holt County, Nebraska, against William Thomassen as agent, manager, and trustee of Elmer and Joan Thomassen with respect to their right, title, and interest in the Holt County property, (the legal description of which was previously set forth). The notices of lien described above were filed and indexed in conformity with 26 U.S.C. Section 6323.

The Government alleges that the conveyance from Elmer and Joan Thomassen of their undivided one-half interest in the Holt County property to their son, William Thomassen, on April 5, 1972, was fraudulent, and seeks to set aside that conveyance and foreclose the federal tax lien on the Holt County property in order to satisfy the default judgment rendered against defendants Elmer and Joan Thomassen by the Tax Court. The defendant William Thomassen argues that his parents did not intend to defraud the United States or any other creditors in transferring the Holt County property to him. Rather, the defendant asserts that his parents were merely giving him a gift, which he claims is legal if they were solvent at the time of the conveyance. (Defendant's Post-Trial Brief at 7).

During the years which the Thomassens incurred the tax liabilities previously mentioned three patients initiated lawsuits against Elmer Thomassen for medical malpractice.[3] (Plaintiff's Exhibits 12, 13, 14). One of these suits resulted in a $50,000

verdict against Elmer Thomassen, on March 16, 1973. (Plaintiff's Exhibit 8). Additionally, on July 9, 1979, the United States Court for the Central District of California found Elmer and Joan Thomassen jointly and severally liable to the United States for past due taxes, interest, and penalties in the amount of $428,197.03, plus interest and penalties. (Plaintiff's Exhibit 16). That court also set aside various conveyances of real property by Elmer and Joan to their close relatives. These fraudulent transactions involved conveyances of real property by Elmer and Joan to Rose Horn (Joan's mother), George Thomassen (Elmer's brother), and William Thomassen. Each of the grantees were found to have no interest in the properties conveyed to them from Elmer and Joan and the California court ordered the sale of the property involved. The conveyances all took place between January 9, 1972 and January, 1973. It was during this period, when Elmer and Joan conveyed all of their real property located in California to their close relatives, that they also transferred the Holt County property to their son William.

The Government asserts that all of the conveyances by Elmer and Joan Thomassen rendered them insolvent and were made with the intent to delay, hinder, and defraud the United States of America, which was already their creditor. (Plaintiff's Post-Trial Brief at 5–6).

The issues to be determined are:

1. Whether the conveyance by Elmer and Joan Thomassen of their undivided one-half interest in the Holt County property to their son, William Thomassen, was fraudulent and therefore void as to the United States, and

2. If the conveyance described above is found to be fraudulent, is the Government entitled to sell the entire property, including Leo Thomassen's undivided one-half interest, to satisfy its tax lien?

---

**3.** Elmer Thomassen is an orthopedic surgeon who operates out of various offices and hospitals in Southern California.

## III. CONCLUSIONS OF LAW

### A. *Fraudulent Conveyance.*

#### 1. *Applicable Law:*

■ As a threshold matter, it must be determined what law this Court must apply in resolving the issue of whether the conveyance from Elmer and Joan Thomassen to William Thomassen was fraudulent. "[U]ntil Congress speaks to the contrary, the existence and extent of liability [in such cases] should be determined by state law." *Commissioner v. Stern,* 357 U.S. 39, 45, 78 S.Ct. 1047, 1051, 2 L.Ed.2d 1126 (1958) (when a fraudulent transfer is alleged, the liability of an innocent transferee to the Government is determined by state law). Consequently, the determination of whether the conveyance in question was fraudulent is governed by Nebraska Law. *See United States v. Fernon,* 640 F.2d 609, 611 (5th Cir.1981).

#### 2. *Requirements for Fraudulent Conveyance.*

The statute governing fraudulent conveyances in Nebraska states:

Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods or things in action, or of any rents or profits issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, made with the intent to hinder, delay or defraud creditors or persons, of their lawful rights, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suit commenced, or decree or judgment suffered, with the like intent as against the persons so hindered, delayed or defrauded, shall be void.

Neb.Rev.Stat. Section 36–401 (Reissue 1978) (since repealed and replaced by the Uniform Fraudulent Conveyance Act. Neb.Rev.Stat. Section 36–601 *et seq.* (cum. supp.1982)).

■ To establish a prima facie case for a fraudulent conveyance, the party challenging the transaction has "the burden of showing the conveyance was one between close relatives and that the consideration appeared to be inadequate." *West Gate Bank of Lincoln v. Eberhardt,* 202 Neb. 762, 277 N.W.2d 104, 106 (1979). After this is achieved, "the burden of proof then shift[s] to the defendants to establish the good faith of the transaction." *Id.,* 277 N.W.2d at 106.

■ Defendant William Thomassen asserts in his post-trial brief, page 15, that the Government must prove actual fraud, i.e. that the Thomassens knew there was a deficiency, in order to have the conveyance set aside under Neb.Rev.Stat. Sections 36–401 *et seq.* A reading of *Jansen v. Lewis,* 52 Neb. 556, 72 N.W. 861 (1897), cited by the defendant for this proposition, reveals that this is not the correct burden. The distinction between *Jansen* and the case at bar is clear. *Jansen* involved a *subsequent* creditor and the instant case involves an existing creditor (the United States).

"A different standard is applied to creditors where debts are in existence at the time of conveyance, as opposed to subsequent creditors. A creditor whose debts did not exist at the date of a voluntary conveyance by the debtor cannot attack such conveyance for fraud unless he pleads and proves that the same was made to defraud subsequent creditors whose debts were in contemplation at the time."

*First National Bank of Kearney v. Bunn,* 195 Neb. 829, 241 N.W.2d 127, 129 (1976). *See also Big Horn Collieries Co. v. Roland,* 116 Neb. 846, 219 N.W. 233 (1928).

The United States was clearly an existing creditor at the time the transaction in question took place. Under 26 U.S.C. Section 6151(a), taxes become due and owing to the United States as of the date prescribed by law for the filing of the return. Section 6151(a) states:

"... when a return of tax is required under this title or regulation, the person required to make such return shall, without assessment or notice and demand from the secretary, pay such tax to the internal revenue officer with whom the

return is filed, and shall pay such tax at the time and place fixed for filing the return...."

A defendant who refuses to sign 1040 and W–4 forms is not immune from the duties imposed by the tax laws. *United States v. Drefke*, 707 F.2d 978 (8th Cir.1983). "[B]y the terms of the Internal Revenue Code [26 U.S.C. Section 6151 (1954)] income tax *liability* matures on the day the return is required to be filed, and the *correct amount* of tax liability becomes *due* at that time, regardless of when the deficiency assessment may be made [citations omitted, emphasis in original]." *Hartman v. Lauchli*, 238 F.2d 881, 887 (8th Cir.1956) (reh'g denied), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1048, 1 L.Ed.2d 915 (1957) (holding that the Government's tax claims became liabilities of the debtor in bankruptcy and constituted provable debts as they matured). *See also United States v. Plastic Electro-Finishing Corp.*, 313 F.Supp. 330, 333 n. 4 (E.D.N.Y.1970) (unassessed tax obligation is sufficiently a debt so as to entitle the Government to move to set aside a fraudulent transfer made by the debtor).

a) *Conveyance between close relatives:*

■ It is uncontroverted that Elmer and Joan Thomassen, husband and wife, conveyed their interest in the Holt County property to their son William Thomassen, by warranty deed dated April 5, 1972. (Filing No. 85, Pretrial Order par. 8). This conveyance is clearly between "close relatives," therefore, under *West Gate Bank,* this Court must address the issue of the adequacy of consideration.

b) *Adequacy of Consideration:*

■ "Inadequacy of consideration is a badge of fraud." *First National Bank of Omaha v. First Cadco Corp.,* 189 Neb. 553, 203 N.W.2d 770, 778 (1973), appeal after remand, 191 Neb. 678, 217 N.W.2d 93 (1974); *Farmers State Bank of Ewing v. Dierks,* 137 Neb. 442, 452, 289 N.W. 860, 866 (1940) (inadequacy of consideration a badge of fraud *and* a circumstance tending to show knowledge of fraud and participation in it). *See also United States Na-tional Bank of Omaha v. Rupe,* 207 Neb. 131, 296 N.W.2d 474, 476 (1980). (conveyance without or for inadequate consideration, made with the intent to delay or defraud creditors, is fraudulent.).

The defendant William Thomassen purportedly paid "one dollar and love and affection" to his parents, Elmer and Joan, for the title to the Holt County property. William's testimony at trial revealed that he did not remember whether he had ever paid his parents the $1.00 consideration. T49:20–50:1. The record shows that William did not know when the transfer of property took place, although he was approximately 18 years old at the time, and also that William was unsure when he first saw the warranty deed conveying the Holt County property from his parents to him. T40:9–41:18.

William admitted making one payment on the land, however, this payment came at a time when he was forced to leave college in 1976 due to financial difficulties. T41:19–42:10, 48:1–7. His memory of making this payment was refreshed by the testimony of Ruth Fried and conflicted with William's deposition taken in March, 1984, wherein he testified that he never made any payments on the property. Rental payments were being made on the land, of which William had knowledge, but he never sought to obtain any of these rental payments. T42:23–43:5. Furthermore, William could not remember the amount of the mortgage payment he purportedly made, whether he had a bank account, where it was located, his balance, or whether or not the check bounced. T44:8–45:23. Such a payment cannot even arguably be considered adequate consideration.

"Love and affection has been held to be inadequate consideration under state fraudulent conveyance laws." *Walker v. Treadwell (In re Treadwell),* 699 F.2d 1050, 1051 (11th Cir.1983), *citing United States v. West,* 299 F.Supp. 661, 666 (D.Del.1969) (deed recited consideration of "one dollar ... and other valuable and lawful considerations" and defendants argued "natural love and affection" is good consideration,

but court held it was not fair consideration); *Roddam v. Martin,* 285 Ala. 619, 622, 235 So.2d 654, 656 (1970). *See also Flatau v. Atef (In re Gaites),* 466 F.Supp. 248, 254 (M.D.Ga.1979) (when recited consideration is love and affection, there is generally a gift). Finally, where there was no consideration other than love and affection in a transfer between relatives, there is no fair consideration. *Jahner v. Jacob,* 252 N.W.2d 1, 6 (N.D.1977) (under North Dakota Fraudulent Conveyance Act).

The Court therefore finds that the Government has met its burden of showing that the conveyance from Elmer and Joan Thomassen to William Thomassen was between close relatives *and* was without adequate consideration. *West Gate Bank,* 202 Neb. 762, 277 N.W.2d 106, interpreted *First National Bank of Omaha v. First Cadco Corp.,* 189 Neb. 553, 203 N.W.2d 770, "to hold that inadequacy of consideration suggests an intent to defraud and shifts the burden to the defendants." Thus, the burden shifts to the defendant William Thomassen to establish the good faith of this transaction.

c) *Presumption of Fraud:*

 "It is well settled law that a deed by a father to his son is presumptively fraudulent as to an existing creditor, and that in litigation between him and the parties to the conveyance over its alleged invalidity the burden is on them to establish the good faith of the transaction by a preponderance of the evidence." *Lincoln Trust Co. v. Sweeney,* 124 Neb. 686, 248 N.W. 67, 68 (1933); *Christensen v. Smith,* 123 Neb. 388, 243 N.W. 118 (1932); *see also Farmers State Bank of Ewing v. Dierks,*

137 Neb. 442, 289 N.W. at 864. This presumption is equally applicable to a conveyance of real estate between close relatives.[4]

The presumption that a conveyance of real property in Nebraska is fraudulent is not evidence. *First National Bank in Kearney v. Bunn,* 195 Neb. 829, 241 N.W.2d 128.

"It may take the place of evidence unless and until evidence appears to overcome or reb ut it, and when evidence sufficient in quality appears to rebut it the presumption disappears and the party having the burden of proof on the issue must, in civil actions, sustain his position by a preponderance of the evidence." *Id.,* 241 N.W.2d at 128.

The defendant William Thomassen has offered no evidence to rebut this presumption. Thus, it remains not as evidence, but as an additional badge of fraud to be considered in determining the validity of this conveyance. The intent of the parties to the transaction must also be scrutinized in light of the fraudulent presumption.

d) *Intent:*

 "A conveyance is declared to be fraudulent when its object or effect is to defraud another, or the intent with which it is made is to avoid some duty or debt due by or incumbent upon the party making the transfer." *Farmers State Bank,* 137 Neb. 442, 289 N.W. at 866. A specific intent need not be proved, rather "[t]he intent may be gathered by the acts of the parties, and a conveyance is fraudulent when it is shown that it was made for the purpose of placing property beyond the reach of creditors, or that it would hinder or delay them in collecting their just demands." *Id.,* 289

**4.** *See First National Bank in Kearney v. Bunn,* 195 Neb. 829, 241 N.W.2d 127 (1976); *First National Bank v. First Cadco Corp., supra,* 189 Neb. 553, 203 N.W.2d 770; *United States National Bank v. Rupe, supra,* 207 Neb. 131, 296 N.W.2d 474; *Creason v. Wells,* 158 Neb. 78, 62 N.W.2d 327, 329 (1954); 8 A.L.R.4th 1105, 1123 (1981). *See also Riggs v. Hroch,* 133 Neb. 260, 274 N.W. 598 (1937); *Bank of Brule v. Harper,* 141 Neb. 616, 4 N.W.2d 609 (1942); *VanSteenberg v. Nelson,* 147 Neb. 88, 22 N.W.2d 414 (1946).

"A reasonable basis for such a presumption and shifting the burden of going forward with the evidence is the recognition by the courts of 'the notorious tendency of the spouses [and other close relatives] to aid each other before they are just to creditors.'"
*United States v. West,* 299 F.Supp. 661, 665 (D.Del.1969); citing McLaughlin, Application of the Uniform Fraudulent Conveyance Act, 46 Harv.L.Rev. 404, 428 (1933).

N.W. at 866, *quoting Becker v. Linton*, 80 Neb. 655, 666, 114 N.W. 928, 932 (1908). "Fraudulent intent may be established by proof of facts from which such inference may be reasonably drawn." *Id.*, 289 N.W. at 866; *Riggs v. Hroch*, 133 Neb. 260, 274 N.W. 598, 600 (1937), *citing Peterson v. Wahlquist*, 125 Neb. 247, 249 N.W. 678 (1933) Additionally, a transfer where a grantor reserves himself a benefit to the detriment of his creditors may constitute evidence of fraud. *First National Bank v. First Cadco Corp.*, 189 Neb. 553, 203 N.W.2d at 779.

In the present case, the actions of the parties involved lead this Court to the conclusion that the conveyance from Elmer and Joan to William was undertaken with fraudulent intent.

As pointed out earlier in this Memorandum, the testimony of William was fraught with inconsistencies and uncertainties concerning the events surrounding the conveyance. T49:16–23. William's testimony reflects inadequate consideration; his financial inability to make any payments on the mortgage (save one the amount of which he could not remember), and his involvement in or receipt of other pieces of property from his parents. These other conveyances were later declared null and void by the United States District Court for the Central District of California. (Plaintff's Exhibit 16).

William testified that the land was "a gift to further [his] education" and give him a start in life. T50:18–21. He had no plans for the property and hardly, if ever, visited or used the land to help improve his financial position. Elmer and Joan Thomassen also retained some benefits or interest in the Holt County property after the purported conveyance to William. The testimony of Ruth Fried indicates that the Frieds received payments from Elmer and Leo until approximately 1975, at which time Elmer stopped making his share of the payments. T31:1–20. The transfer to William occurred in April, 1972, however, Elmer continued to pay the mortgage payments on William's interest for several years after the transfer. T72:4–14. Elmer testified that although he expected William to work his way through school, he did not expect William to make the $2000 mortgage payments on the Holt County property all the time. T93:14–19.

In determining the validity of an allegedly fraudulent conveyance, "[t]he ability of the grantee to pay the encumbrance is also a fact to be considered." *First National Bank of Omaha v. First Cadco Corp.*, at 558, 203 N.W.2d 779. Elmer and Joan's retention of the enjoyment, possession, and control of the Holt County property after the purported conveyance, in addition to their continued payment of the mortgage in William's behalf, pin yet another badge of fraud on this transaction. *See United States v. Bertie*, 529 F.2d 506, 508 (9th Cir.1976).

Elmer Thomassen's motives for conveying away his real property also show "fraudulent intent." Elmer testified that during 1972 and 1973 he conveyed all of his real property to close relatives. T96:16–18. Several conveyances were made to William, involving property in Riverside County, California and Orange, California, all of which were subsequently set aside. Several malpractice suits were pending against Elmer during 1970 and 1972, a judgment was rendered against him in March 19, 1973, for $50,000 (Plaintiff's Exhibits 8, 12, 13, 14), and Elmer and Joan incurred substantial tax liabilities during the years 1964–1971. This evidence leads this Court to conclude that their motivation behind the conveyance to William of the Holt County property was to hinder, delay or defraud their existing creditors, particularly the United States. To the extent the conveyance appears to have been motivated by Elmer's tax liabilities and pending litigation with the Internal Revenue Service, such a transfer indicates fraudulent intent. *See United States v. Bertie*, 529 F.2d 508 (pendency of litigation by Internal Revenue Service a badge of fraud).

From the above analysis, this Court finds and concludes that the conveyance of Elmer and Joan Thomassen's interest in the

Holt County property to William Thomassen was made with fraudulent intent as to the United States.

e) *Insolvency:*

The last badge of fraud under which this conveyance must be analyzed, to determine whether it was fraudulent and whether the defendant has rebutted the fraudulent presumption, is the solvency of Elmer and Joan Thomassen. Defendant asserts that it was not Elmer and Joan's intent to defraud the United States or other creditors when they conveyed the Holt County property to William and that parents can give a gift to their son if they are solvent when the gift is made. (Defendant's Post Trial Brief, page 7). Additionally, defendant argues that the conveyance was not fraudulent because at the time of the transfer, Joan and Elmer were solvent. (Defendant's Post-Trial Brief, page 9).

In *Lincoln Trust Co. v. Sweeney,* 124 Neb. 686, 248 N.W. 67, creditors sought to cancel a deed from parents to their son which was executed for the nominal consideration of one dollar. Defendants argued, *inter alia,* that the deed was executed, delivered, and registered in good faith when the father was solvent, and that plaintiff had a lien on other land of the grantors, which afforded ample security for the payment of the judgment. *Id.* The father owned several tracts of farmland, encumbered with mortgages. Plaintiff became owner of a note and mortgage via an assignment, after which the father defaulted. The father subsequently conveyed property to his son and almost nine months later, plaintiff recovered a judgment against the father. Plaintiff was unable to execute on the judgment because the father had turned over all personal property and unencumbered real estate to his son.

From the evidence, the court in *Sweeney* concluded that the father intended to delay the creditor from collecting its debt which had been reduced to judgment. The court

stated that "[a]s to an existing creditor, a conveyance with such an intent is declared by statute to be void." *Id.,* 248 N.W. at 68, citing Neb.Rev.Stat. Section 36–401 (1929).[5] The conveyance from the father to the son was found to be fraudulent as to the existing creditors, and the fact that the debtor retained property in his own name, sufficient to satisfy the judgment, does not defeat the creditor's action. *Id.,* at 248 N.W. at 68. *See Shreck v. Hanlon,* 66 Neb. 451, 92 N.W. 625 (1902) (in an action to set aside a fraudulent conveyance, it is not always a defense that grantor had property remaining after the conveyance was made which would satisfy creditors).

The defendant in his post-trial brief, goes through an analysis of Elmer and Joan Thomassen's assets and liabilities in an attempt to show their solvency on the date the Holt County property was conveyed to William. The figures and valuations proffered by the defendant through the testimony of Elmer Thomassen and Joseph G. Krane (Elmer's accountant) carry little weight or probative value on the issue of Elmer and Joan's solvency. It has been noted that "where testimony relied on to show good faith of an allegedly fraudulent conveyance is given by interested parties, [or relatives only], the reasonableness or unreasonableness of their evidence bears considerable weight in arriving at a just conclusion." *Filley v. Mancuso,* 146 Neb. 493, 20 N.W.2d 318, 321 (1945); *Farmers State Bank of Ewing v. Dierks,* 137 Neb. 442, 289 N.W. 860, 865; *VanSteenberg v. Nelson,* 147 Neb. 88, 22 N.W.2d 414, 417 (1946); *Bank of Brule v. Harper,* 141 Neb. 616, 4 N.W.2d 609 (1942).

The testimony of Elmer, Joan, and William must be taken in light of the above proposition. Defendant William Thomassen attempts to point out that Elmer and Joan retained substantial property after the Holt County property was conveyed to him on April 5, 1972. In support of this argument, William presented and relies on

---

**5.** The statute in effect and applied by the court in *Sweeney* (Neb.Rev.Stat. Sec. 36–401 (1929), is identical to the 1978 version which this Court now applies to the case at bar. No amendments to the 1929 version were made until 1980.

the testimony of an accountant from California, Joseph G. Krane. Mr. Krane testified at trial as to Elmer and Joan Thomassen's assets and liabilities, including the value of property purportedly owned by the Thomassens. The figures and information testified to by Mr. Krane and submitted by the defendant in his brief at pages 11–14 were compiled by Mr. Krane approximately 10 days before the trial of this action. T138:18–139:17. Many of the figures were arrived at with Elmer Thomassen's help or based on his word and were not independently verified. T117:14–119:21. These figures were summarized by Mr. Krane and received into evidence as defendant's Exhibit No. 118, however, the Court pointed out at trial its reluctance to give Mr. Krane's figures, compiled in Exhibit 118, any probative value. T121:19–122:5. Considering the fact that the summary was hurriedly prepared for trial, its unverified figures, and its obvious reliance on information furnished by Elmer Thomassen, the figures contained in defendant's Exhibit 118 and in defendant's brief at 11–14 carry little, if any, probative value.

Defendant arrived at a figure of $20,-512.28 which purportedly represents the excess of assets over liabilities at the time of the conveyance. (Defendant's Post Trial Brief at 13). The Court notes that the figures attempting to show Elmer and Joan Thomassen's solvency are incorrect.

A close analysis of the property included by the defendant in the asset portion of the financial summary reveals that one piece of property—described as property in Riverside County (29 acres in Elsinore)—was not owned by Elmer and Joan at the time they conveyed the Holt County property to William. (Defendant's post-trial brief at 11; plaintiff's Exhibit 16, at 2–3). The Riverside County property was conveyed by Elmer and Joan to William Thomassen on January 15, 1972. T94:3–10; plaintiff's Exhibit 16 at 3. This piece of property was apparently included as an asset of Elmer Thomassen in computing his asset and liabilities statement. *See* Defendant's Post-Trial Brief, at 11. The Holt County property was conveyed to William on April 5, 1972, therefore, the inclusion of the Riverside County property improperly inflates Elmer and Joan's assets. Using the defendant's own estimates of the value of this property, $29,000 (T129:19–25), and deducting that amount from the total assets set forth in defendant's Post-Trial Brief at 13, Elmer and Joan Thomassen clearly had greater liabilities than assets on the date they transferred the Holt County property to William.

The Court concludes that Elmer and Joan Thomassen were left with insufficient assets to meet their existing and anticipated obligations, including but not limited to their unpaid federal income tax liabilities, as a result of the conveyance in question.

### 5. *Conclusion:*

█ In sum, the Court finds that:

a) the conveyance of the Holt County property from Elmer and Joan Thomassen to William Thomassen was made without fair or adequate consideration.

b) the United States of America was an existing creditor of Elmer and Joan Thomassen at the time of the conveyance in question.

c) the conveyance in question was made by Elmer and Joan Thomassen with a fraudulent intent to hinder, delay, and defraud the United States.

d) Elmer and Joan Thomassen were left with insufficient assets to meet their existing and anticipated obligations and thus were insolvent at the time of the purported conveyance of the Holt County property to William or rendered insolvent thereby.

e) the conveyance of the Holt County property to William Thomassen from Elmer and Joan Thomassen was fraudulent as to the United States.

f) Elmer and Joan Thomassen are indebted to the United States in the amount of the assessments described in footnote 2 and in the Pretrial Order, Filing No. 85), together with accrued interest and penalties. The tax lien of the United States encumbers their interest in the Holt Coun-

ty property, described herein. The tax lien is superior to any interest of William Thomassen in said property.

g) the interest of Harold and Ruth Fried, as evidenced by the mortgage they hold on the Holt County property, is prior and superior to the United States of America's lien on said property to the extent of the unpaid balance on the mortgage.

h) the conveyance from Elmer and Joan Thomassen to William Thomassen of real property, described herein as the Holt County property, on April 5, 1972, is void and therefore set aside.

B. *Foreclosure on the property.*

 The final issue that this Court must address is whether the Government is entitled to foreclose on the entire Holt County property, including Leo Thomassen's undivided one-half interest, or whether the Government can only foreclose on the one-half interest owned by Elmer and Joan Thomassen.

Leo and the Government rely exclusively on *United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) for support of their respective positions and submit that it is controlling on this issue. The Court agrees that *Rodgers* controls the outcome of this issue, but it is by no means on all fours with the case at bar.

The statute which *Rodgers* addressed and under which this action has proceeded states in pertinent part:

"The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States."

26 U.S.C.A. Section 7403 (West.Supp.1967). In *Rodgers*, the Supreme Court addressed the issue of whether Section 7403 authorizes the judicial sale of a "home in which a delinquent taxpayer had an interest at the time he incurred his indebtedness, but in which the taxpayer's spouse, who [did] not owe any of that indebtedness, also [had] a separate 'homestead' right" under Texas law. *Id.* at 680, 103 S.Ct. 2136. The court held "that the statute does grant power to order the sale, but that its exercise is limited to some degree by equitable discretion." *Id.*, 103 S.Ct. at 2142.

The court read Section 7403 "to contemplate, not merely the sale of the delinquent taxpayer's own interest, but the sale of the entire property (as long as the United States has any 'claim or interest' in it), and the recognition of third-party interests through the mechanism of judicial valuation and distribution." *Id.* at 694, 103 S.Ct. 2143. However, the court also concluded that "Section 7403 does not require a district court to authorize a forced sale under absolutely all circumstances, and that some limited room is left in the statute for the exercise of reasoned discretion." *Id.* at 706, 103 S.Ct. 2149.

The presence of some judicial discretion is grounded in the fact that a proceeding under Section 7403 is an equitable proceeding and, as such, any exercise of that discretion "can take into account both the Government's interest in prompt and certain collection of delinquent taxes and the possibility that innocent third parties will be unduly harmed by that effort." *Id.* at 708–709, 103 S.Ct. 2150, 2151.

In an attempt to emphasize the limited nature of the discretion which the district courts have, the Court enumerated four considerations which it deemed important in deciding whether to go ahead with a forced sale. Briefly summarized, these considerations which this Court should consider are as follows:

1) "the extent to which the Government's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest actually liable for the delinquent taxes." *Id.* at 710, 103 S.Ct. 2151;

2) whether an innocent/non-delinquent third-party has a legitimate or legal expectation that his separate interest would not be subject to a forced sale by the delinquent taxpayer or his creditors. *Id.*, 103 S.Ct. 2151;

3) the prejudice to the third-party in personal dislocation costs and undercompensation. *Id.*, 103 S.Ct. 2152;

4) "the relative character and value of the non-liable and liable interests held in the property." *Id.*, 103 S.Ct. 2152.

Before analyzing the first consideration, several pertinent figures need to be set out. The total purchase price for the approximately 1120 acres comprising the Holt County property was $78,000. This was divided between Leo and his wife, and Elmer and Joan Thomassen. The down payment was $8,000 of which Leo and Elmer each paid $4,000. The mortgage balance owed to the Frieds, who have first priority pursuant to the previously mentioned stipulation, is $47,900, without interest, as of August 15, 1984. Testimony at trial indicated that neighboring land had sold for $77 per acre, and defendant Leo Thomassen indicated in his brief, p. 7, that the Holt County property is worth between $75 and $100 per acre.

The Court first considers whether the Government will be financially prejudiced by sale of only Elmer's one-half interest in the property. For purposes of illustration, the Court will look at how much the Government stands to gain if all or half the property is sold for the highest and the lowest values mentioned.

### SALE OF THE WHOLE PROPERTY

Assuming sale brings $75 per acre:

| | | | |
|---|---|---|---|
| 1120 acres × $75 = | | | $84,000 |

Less:

| | | | |
|---|---|---|---|
| Fried's mortgage | $47,900 | | |
| Leo's one-half interest (less his share of mortgage) $42,000 − $23,950 | | 18,050 | 65,950 |
| | | | 18,050 |

Assuming sale brings $100 per acre:

| | | | |
|---|---|---|---|
| 1120 acres × $100 = | | | 112,000 |

Less:

| | | | |
|---|---|---|---|
| Fried's mortgage | $47,900 | | |
| Leo's one-half interest (less his share of mortgage) $56,000 − 23,950 = | | 32,050 | − $79,950 |
| | | | 32,050 |

### SALE OF ELMER'S ONE-HALF INTEREST

Assuming sale brings $75 per acre:

| | |
|---|---|
| 560 acres × $75 = | 42,000 |

Less:

| | |
|---|---|
| Fried's mortgage (for amount due on Elmer's ½ interest: $47,900 ÷ 2) | −23,950 |
| | $18,050 |

Assuming sale brings $100 per acre:

| | |
|---|---|
| 560 acres × $100 | $56,000 |

Less:

| | |
|---|---|
| Fried's mortgage (for amount due on Elmer's ½ interest: $47,900 ÷ 2) | −23,950 |
| | $32,050 |

From the above analysis, it is apparent that a sale of just Elmer's one-half interest would not prejudice the Government's financial interest. Only the sale price will change the amount the Government may get from a forced sale, and with farm land prices being in the depressed state that they currently are, the Court will not indulge in further speculation as to the final sale price. A sale of only half of the land may not bring as high a price as the Government would desire, however, it would certainly not be "worthless" as the Government contends. Plaintiff's post-trial brief, p. 16. The Court therefore concludes and finds that the sale of only Elmer and Joan Thomassen's one-half interest in the Holt County property would not prejudice the Government's financial interests.

The second consideration which the Court in *Rodgers* set forth asks whether Leo had any legal expectation that his interest would not be subject to a forced sale under Nebraska law. "It appears to be well settled in this state that a judgment lien on real estate in the name of the judgment debtor is a lien only on the actual interest of the judgment debtor and is subject to all existing equities whether of record or not," *Halsted v. Halsted*, 169 Neb. 325, 99 N.W.2d 384, 386 (1959). *See*

*also Action Realty Co., Inc. v. Miller,* 191 Neb. 381, 215 N.W.2d 629, 639 (1974); *Roberts v. Robinson,* 49 Neb. 717, 68 N.W. 1035, 1036 (1896). Leo Thomassen may have had some expectation, under this principle, that his interest would not be subject to a forced sale to satisfy liens against his co-tenant.

Under Neb.Rev.Stat. Section 25–2170, *et seq.* (Reissue 1979), "[a]ll tenants in common, joint tenants, or lessees of any estate in land or interest therein ... may be compelled to make or suffer partition...." Partition may be compelled by any joint owner of real estate or other interests therein. Neb.Rev.Stat. Section 25–2170.01. There are numerous exemptions from an execution or forced sale set out in Neb.Rev. Stat. Sections 25–1552 to 25–1563; however, these provisions do not protect Leo's interest in the land from forced sale.

A sale of Elmer's undivided one-half interest would not necessarily require that the land be partitioned prior to the sale. After the sale of the undivided interest is completed, the new owner could force a partition of the property if he or she so desired. Under such a sale the buyer would naturally take the land subject to the existing mortgage and the Government would receive the proceeds less the mortgage balance on the one-half interest.

The third consideration requires the Court to look at the prejudice to Leo in personal dislocation costs and undercompensation. There are approximately 100 head of cattle (cows) on the land about 50 of which have calves. T23:5–23. This cow-calf operation has been run by Leo since 1971 or 1972. There is no evidence of what it would cost to relocate the cattle, however, it is apparent that such a relocation would be an added expense to Leo Thomassen that he otherwise would not have incurred. Similarly, there was no evidence introduced as to the depressed condition of the real estate market for Nebraska farmland. However, a forced sale at this time would inevitably work a hardship on Leo Thomassen by forcing him to look elsewhere for land to raise his cattle.

Financial compensation would be of little help to Leo if the proceeds of a sale of the entire property were insufficient to enable him to purchase other land to continue his cattle operation. While this situation does not involve "a roof over one's head" as *Rodgers* did, this Court cannot be "blind to the fact that in practical terms financial compensation may not always be a completely adequate substitute...." *Rodgers,* 103 S.Ct. at 1248. This is particularly true where the property, although not used as a personal residence, is necessary to the co-tenant's livelihood. This Court therefore concludes and finds that there are hardships present in the instant case which would prejudice Leo Thomassen if the entire tract was sold.

The final consideration which this Court will consider is the relative interests that Leo and Elmer hold in the property. Elmer stopped making payments on the land sometime in 1976. T31:1–17. In 1977 William Thomassen made one payment to the Frieds approximately 5 years after the land had been fraudulently conveyed to him. During this time Leo kept up his portion of the payments. After a period of time during which neither Elmer nor William made any payments, the Frieds renegotiated the mortgage with Leo in 1979 and since that time Leo has made both his payments and Elmer's payments. (The payments were originally made annually, but are now made monthly by Leo). Leo has paid all the taxes on the land since it was purchased, however, the taxes have not been paid since 1980. T13:7–19. Leo's takeover of Elmer's payments and the subsequent renegotiation of the mortgage were apparently carried out pursuant to the Agreement of December 8, 1969.

Leo and Elmer Thomassen have had little communication with each other since their joint purchase of the property. The record does not reveal any collusion between Elmer and Leo which would indicate an intent to prevent a sale of the entire property, or an attempt to defraud the United States.

Leo points out in his brief at page 7, that he had made two-thirds (⅔) of the pay-

ments due and Elmer has made one-third (⅓) of the payments. Although not in evidence, these figures show for illustrative purposes, the disparity of the interests held by Leo and Elmer. Leo has paid in approximately $16,000, while Elmer has paid approximately $8,000 on his portion, and this does not include the payment of taxes which, as mentioned earlier, were made entirely by Leo. This disparity in the interests held by Elmer (the delinquent taxpayer) and Leo (the innocent third-party) gives yet another reason why the entire property should not be subject to a forced sale. The Court therefore concludes and finds that Leo Thomassen's relative interest in the property, when compared to Elmer's interest, falls within the parameters of the fourth consideration set out in *Rodgers,* and as such, gives the Court additional grounds to exercise its limited discretion in allowing only Elmer's interest to be sold.

Finally, the list of considerations provided by *Rodgers* is by no means "exhaustive." *Id.* 461 U.S. at 711, 103 S.Ct. 2152. The Court notes that the Holt County property is not the only piece of property which Elmer Thomassen owns. Evidence shows that Elmer and Joan Thomassen own five parcels of land in California, only one of which had been foreclosed upon at the close of the trial. The Government indicated that it was attempting to sell the California properties, but that Elmer and Joan's tax liabilities exceed the value of all the pieces of property. T147:19–149:6. Apparently these properties are not held jointly with other parties and therefore do not suffer from the confusing problems that are present with the Holt County property. There is no evidence before the Court as to the status of the Government's proceedings against the California properties, however, the fact that there are other avenues by which the Government may satisfy its tax liens, provides another reason

for prohibiting the Government from forcing a sale of the entire Holt County property.

## IV. CONCLUSION

The above analysis of the considerations set forth in *United States v. Rodgers,* 103 S.Ct. 2132, clearly distinguishes this case from those situations which *Rodgers* and previous courts have addressed. In the instant case we have an innocent co-tenant who would suffer some financial hardship and displacement of his cow-calf operation if the entire property were foreclosed under 26 U.S.C. Section 7403. The situation in *Rodgers* dealt with a "homestead right," rather than an actual undivided ownership interest in the property, as in the case at bar.[6]

The equitable considerations which *Rodgers* requires this Court to consider outweigh the Government's need to sell the entire Holt County property. No prejudice will result in limiting the Government to a sale of only Elmer Thomassen's one-half interest. The Court therefore concludes and finds that the Government is entitled to sell only Elmer Thomassen's undivided one-half interest in the property.

A separate Order shall be issued contemporaneously with this Memorandum Opinion.

## ORDER

In accordance with the Court's Memorandum Opinion issued this date IT IS HEREBY ORDERED THAT;

1) the conveyance from Elmer and Joan Thomassen to William Thomassen of an undivided one-half interest of real property, described herein as the Holt County property, on April 5, 1972, is void and therefore set aside;

2) the plaintiff United States of America is entitled to sell Elmer and Joan Thomas-

---

**6.** This property cannot be classified as a homestead under Neb.Rev.Stat. Section 40–101 (Reissue 1978), because "homestead" means house and land where the family dwells. *Horn v. Gates,* 155 Neb. 667, 53 N.W.2d 84, 87 (1952). Presently no one is living on the land which

consists of approximately 1120 acres of which 138 acres are irrigated and the remainder being pasture and timberland. T13:23–14:9. There are also several unoccupied buildings on the property.

sen's undivided one-half interest in the Holt County property; and

3) the interests of the lienholders shall be satisfied in the order set forth in the accompanying Memorandum Opinion.