225 F.Supp.2d 1138 (2001)
Michael J. ROBERTS, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 4:99CV489.
United States District Court, E.D. Missouri, Eastern Division.
December 19, 2001.
Bruce D. Ryder, Partner, Thompson Coburn, J. Joseph Raymond, III, St. Louis, MO, for Michael J. Roberts.
Jane Rund, Office of U.S. Attorney, St. Louis, MO, Robert D. Metcalfe, U.S. Department of Justice, Office of Special Litigation, Tax Div., Washington, DC, for United States of America.

MEMORANDUM AND ORDER
WEBBER, District Judge.
This matter is before the Court on Defendant's Motion to Dismiss [doc. # 46] and Defendant's Motion for Summary Judgment [doc. #46]. Plaintiff has filed his Acquiescence in Defendant's Limited Motion to Dismiss, indicating that he consents to the motion to dismiss filed by the Government. Therefore, Plaintiff's claim for tax refund relative to the 1993 tax year will be dismissed based on the fact that Plaintiff's claim for a refund of federal income taxes for the 1993 taxable year is time-barred under § 6511 of the Internal Revenue Code.

I. STATEMENT OF FACTS.

A. CIRCUMSTANCES LEADING UP TO THE OFFER IN COMPROMISE.
Plaintiff Michael J. Roberts, the plaintiff and taxpayer in this case, resides at 10428 Jade Forest Drive in St. Louis, Missouri, and has lived there since 1991. Before that, he lived at 10627 Tesshire, St. Louis, Missouri. In 1984 or 1985, Plaintiff started *1139 two businesses: (1) M.J. Roberts Construction, which provided demolition and excavation services, and (2) Roberts Disposal, Inc., a construction debris trash company. Both of these were formed as sub-chapter S-Corporations, and were located at 10627 Tesshire, St. Louis, Missouri. Plaintiff was the president and majority stockholder in both businesses, and his brother, Thomas E. Roberts, was an employee. Arnold J. Lohbeck, a certified public accountant in Fenton, prepared corporate income tax returns (Forms 1120) for M.J. Roberts Construction, Inc. He has known Plaintiff since he was sixteen years old, and has prepared Plaintiff's personal income tax returns (Forms 1040) since the 1983 taxable year. Plaintiff was divorced from his former wife, Diane, in 1988.
By 1989, both of Plaintiff's businesses, according to Plaintiff, "were on real shaky ground," and went out of business around 1990. On January 7, 1992, IRS Revenue Agent Donna R. Mecey sent Plaintiff a letter informing him that his 1989 federal income tax return had been selected for examination by the Internal Revenue Service. After Plaintiff received the January 7, 1992 IRS letter, he asked his CPA, Mr. Lohbeck, to help with the IRS audit. Lohbeck then prepared Plaintiff's 1989, 1990 and 1991 federal income tax returns. The first page of Plaintiff's 1989 tax return shows that Agent Mecey received his 1989 return on May 4, 1992. The IRS subsequently received Plaintiff's 1990 and 1991 tax returns on September 2, 1993. Following her examination of Plaintiff's 1989-1991 tax returns, Agent Mecey prepared a Revenue Agent Report (RAR) which proposed the assessment of the following income tax deficiencies against Plaintiff: for the taxable year 1989, a proposed tax deficiency of $25,067; for the taxable year 1990, a proposed tax deficiency of $53,903; for the taxable year 1991, a proposed tax deficiency of $1,350. Together with statutory interest, the amounts which the IRS determined Plaintiff owed for each of the taxable years under examination were: $34,686 (1989), $68,089 (1990), and $1,521 (1991). During the IRS examination of Plaintiffs' 1989-1991 federal income tax returns, CPA Lohbeck and attorney Charles M. Locke represented Plaintiff under a "Power of Attorney and Declaration of Representative" (IRS Form 2848). This "Power of Attorney" form covered Plaintiff's 1989-1993 federal income tax liabilities. Using the authority given him under the "Power of Attorney" form, Lohbeck signed the RAR prepared by Agent Mecey on November 17, 1993 to agree with her findings that Plaintiff was liable for unpaid federal income taxes and interest for the taxable years 1989-1991. Before signing the RAR, Lohbeck discussed the RAR with Plaintiff. By signing this RAR, Lohbeck waived Plaintiff's right to contest the proposed 1989-1991 income tax deficiencies with the United States Tax Court and consented to the immediate assessment and collection of the deficiencies. On the following dates, a delegate of the Secretary of the Treasury properly and timely made assessments against Plaintiff for unpaid federal income taxes and statutory interest:

Taxable Date of Amount of Unpaid Balance of Accruals as
Period Ending Assessment Assessment[1]of November 1, 2001

*1140
12/31/89 10/05/92 $24,585.79(1)
----------------------------------------------------------------------------------------
 1,809.40(2)
----------------------------------------------------------------------------------------
 1,008.30(3)
----------------------------------------------------------------------------------------
 2,599.92(4)
----------------------------------------------------------------------------------------
 12/20/93 25,067.00(5)
----------------------------------------------------------------------------------------
 9,733.04(4)
----------------------------------------------------------------------------------------
 1,512.45(2)
----------------------------------------------------------------------------------------
 1,336.09(5)
----------------------------------------------------------------------------------------
 06/09/97 2,305.15(3) __________
----------------------------------------------------------------------------------------
 $32,214.81
----------------------------------------------------------------------------------------
12/31/90 12/20/93 $54,903.00(5)
----------------------------------------------------------------------------------------
 13,407.43(4)
----------------------------------------------------------------------------------------
 05/09/94 1,445.25(3)
----------------------------------------------------------------------------------------
 05/13/96 7,312.00(5)
----------------------------------------------------------------------------------------
 04/28/97 10,323,26(3)
----------------------------------------------------------------------------------------
 41,293.00(5) __________
----------------------------------------------------------------------------------------
 $55,797.81
----------------------------------------------------------------------------------------
12/31/91 12/27/93 $ 2,873.00(5)
----------------------------------------------------------------------------------------
 377.78(4)
----------------------------------------------------------------------------------------
 12/20/93 1,350.00(5)
----------------------------------------------------------------------------------------
 174.59(4)
----------------------------------------------------------------------------------------
 04/13/98 3,128.00(5) __________
----------------------------------------------------------------------------------------
 $ 2,703.43
----------------------------------------------------------------------------------------
12/31/92 03/14/94 $78,228.00(1)
----------------------------------------------------------------------------------------
 2,859.21(6)
----------------------------------------------------------------------------------------
 9,038.79(2)
----------------------------------------------------------------------------------------
 3,682.47(3)
----------------------------------------------------------------------------------------
 4,678.67(4)
----------------------------------------------------------------------------------------
 04/13/98 2,859.21(6)
----------------------------------------------------------------------------------------
 9,038.79(2)
----------------------------------------------------------------------------------------
 66,954.00(5) __________
----------------------------------------------------------------------------------------
 $68,947.68
----------------------------------------------------------------------------------------

The IRS also assessed a $9,953.75 penalty against Plaintiff under 26 U.S.C. § 6672 of the Internal Revenue Code in connection with Plaintiff's wilful failure, as a person responsible for withholding, collecting and paying over to the IRS the federal income and social security taxes which were withheld from the wages of the employees of Plaintiff's company, Roberts Disposal, Inc., to pay over the withheld taxes for the fourth quarter of 1989 to the IRS.[2]

B. PLAINTIFF ENTERS INTO THE OFFER IN COMPROMISE.
On or about August 24, 1994, Plaintiff submitted an Offer in Compromise (the "settlement agreement" or "OIC") (Form 656) to the IRS with respect to his unpaid *1141 federal income tax liabilities for 1989-1993 and a Trust Refund Recovery Penalty (also referred to as a "100-percent penalty" or "Section 6672 penalty") with respect to Roberts Disposal, Inc., for the taxable quarter ending December 31, 1989. Plaintiffs OIC provided, in pertinent part, that he was to pay $30,000 to the IRS to compromise his 1989-1993 federal income tax liabilities and the Trust Fund Recovery Penalty (TFRP) assessed against him. The OIC specifically provided that the $30,000 was to be paid within sixty days following notice of its acceptance by the IRS. Paragraph 6 of the OIC stated that "I/we submit this offer for the reason(s) checked below":
[X] Doubt as to collectibility ("I can't pay.").
As additional consideration for the Government's acceptance of the OIC, Plaintiff agreed, in a collateral agreement to the OIC, to waive the benefit of any net capital losses that he might be entitled to claim in connection with the failure, demise or sale of M.J. Roberts Construction, Inc., and Roberts Disposal, Inc. Paragraph (d) of the "Terms and Conditions" printed on the reverse side of the Form 656 OIC signed by Roberts provided as follows: "I/we will comply with all provisions of the Internal Revenue Code relating to my filing my/our returns and paying my/our required taxes for five (5) years from the date IRS accepts the offer." Paragraph (o) of the "Terms and Conditions" printed on the reverse side of the Form 656 OIC signed by Plaintiff provided as follows:
If I/we fail to meet any of the terms and conditions of the offer, the offer is in default, and IRS may:
(i) immediately file suit to collect the entire unpaid balance of the offer;
(ii) immediately file suit to collect an amount equal to the original amount of the tax liability as liquidated damages, minus any payments already received under the terms of this offer;
(iii) disregard the amount of the offer and apply all amounts already paid under the offer against the original amount of tax liability;
(iv) file suit or levy to collect the original amount of the tax liability, without further notice of any kind.
IRS will continue to add interest, as required by section 6621 of the Internal Revenue Code, on the amount IRS determines is due after default ....
At the time he submitted the OIC on August 24, 1994, Plaintiff was represented by his attorney, Mr. Locke. Plaintiff paid $30,000 to the IRS at the time he submitted the OIC in August 24, 1994. The $30,000 was a loan from his brother's company, Commercial Development Company, Inc. By letter dated September 28, 1994, the IRS notified Plaintiff that the OIC had been accepted. This letter stated, in pertinent part, that "We have accepted the offer in compromise (Form 656) you submitted, subject to the terms and conditions outlined in the enclosed document(s). These terms including filing and paying all taxes due for the next five years." When asked at his deposition about the significance or importance to him of the September 28, 1994 IRS letter accepting the OIC, Plaintiff stated that he had "to pay taxes on time over the next five years and forfeit any refunds for M.J. Roberts Construction or Roberts Disposal."

C. PLAINTIFF'S PAYMENT OF HIS 1995 TAX RETURN.
Plaintiff obtained two extensions of time to file his 1995 U.S. Individual Income Tax Return (Form 1040), prepared by CPA Ronald J. Kanterman of the accounting firm of Brown, Smith & Wallace LLC. Plaintiff signed his 1995 income tax return on October 15, 1996. Plaintiff's 1995 *1142 federal income tax return reported total income of $726,902.00. This included a salary of $81,923 from Commercial Development Company, Inc., business income of $23,204, capital gain of $479,292, and $137,214 from "rental real estate, royalties, partnerships, S corporations, trusts, etc." Plaintiff's 1995 Form 1040 also reported that he underpaid his federal income tax liabilities by $246,254. Plaintiff testified that he was aware of this underpayment when he signed his 1995 tax return on October 15, 1996. Plaintiff also testified that he was concerned about the $246,254 tax liability when he signed his 1995 tax return because "[a]t the time I don't believe we had money to pay that." When asked why he was unable to pay his 1995 tax liability, Plaintiff stated that he though "it was invested in other projects."
Prior to signing his 1995 Form 1040, Plaintiff discussed with his accountant, Ronald Kanterman, the extent of his income tax liability for the 1995 taxable year. Kanterman was aware of the amount of Plaintiff's 1995 tax liability at least thirty days prior to October 15, 1996, the date on which Plaintiff signed his 1995 tax return. Kanterman was also aware of the OIC which Plaintiff entered into with the IRS, and that the OIC required Plaintiff to file his returns and pay his taxes for five years from the date the OIC was accepted by the IRS. At the time Plaintiff signed his Form 1040 for 1995, he told Kanterman that he would be unable to pay the $246,000 tax liability shown as due and owing on that return. Plaintiff's 1040 shows that he paid no estimated tax payments for the 1995 taxable year, despite Kanterman having discussed Plaintiff's need to do so. Plaintiff told Kanterman that he could not afford to make the estimated payments.
The Government states that Kanterman explained the reasons for delaying the filing of Plaintiff's 1995 tax return until October 15, 1996, the maximum time permitted by law. The Government contends that Kanterman stated the first reason for the delay was that Plaintiff lacked the financial resources to pay his 1995 tax liability in full. However, Plaintiff disputes this contention, stating that Kanterman stated that Plaintiff needed the six month extension because "the company was short of money at the time ...." Plaintiff's Response to Defendant's Statement of Uncontroverted Facts ¶ 37. This, according to Plaintiff, means that Plaintiff did not have the cash on hand to pay the bill, but could have borrowed the money to do so. Plaintiff states in his Declaration, attached as Plaintiff's Exhibit 2 to Plaintiffs opposition to Defendant's Motion for Summary Judgment, that although he lacked "any appreciable amount of cash as of October 15, 1996, I did have the capacity to borrow sums at this time. As of January 1, 1997, I stood ready, willing, and able to pay the IRS the amount shown as due upon my 1995 federal tax return after all offsets were given for the carryback of my 1996 net operating losses." Id. The other reasons that Kanterman expressed when explaining the reason for the delay in filing the 1995 return are not contested, and are (2) the unavailability of records and the need to complete tax returns for other entities; and (3) Kanterman's concern that his firm would not be paid its accounting fees.
Kanterman also prepared the 1996 Form 1040 for Roberts and his wife, filed with the IRS on or about January 8, 1997. Kanterman testified that the reason for filing the 1996 return early was that "[t]here was an amount due on the 1995 return to the IRS that was known by the taxpayer that there would be a loss for 1996, 1996 taxable year that would reduce the amount due for the 1995 year. It was the taxpayer's wish that we complete the return as fast as possible so that the taxpayer *1143 could make payment to the IRS vis-a-vis the net operating loss carryback." Plaintiff received notice and demand for payment of his 1995 federal income tax liabilities from the IRS prior to the preparation and filing of the 1996 return in January of 1996. Plaintiff's 1996 return indicated a negative total income of $485,087 and a negative adjusted gross income of $488,159. Plaintiff's net operating loss for the 1996 tax year was reported on an Application for Tentative Refund (Form 1045) which was filed simultaneously with Plaintiff's 1996 Form 1040, and carried back, in order, to the 1993, 1994 and 1995 tax years.
Paragraphs 42 and 43 of Defendant's Statement of Uncontroverted Facts are not disputed by Plaintiff, but he attempts to clarify them in his response. Paragraphs 42 and 43 read:
42. Although plaintiff carried back a net operating loss of nearly half a million dollars from the 1996 tax year to the 1993, 1994 and 1995 tax years, he remained indebted to the United States (according to his accountant's calculations) for unpaid 1995 federal income taxes in the amount of $129,539.00 after the 1996 loss had been carried back to the preceding three taxable years.
43. Even after the income tax refunds generated by the carryback of the 1996 net operating loss to the 1993-1995 tax years were applied to Robert's 1995 tax liability, an unpaid balance of $101,076 remained for that taxable year.
Plaintiff states the following to clarify these two statements:
In January and, again, in April of 1997, Plaintiff made two separate Form 1045 filings carrying back losses from 1996 to the three preceding tax yearsi.e., 1993, 1994, and 1995as required by the Internal Revenue Code § 172[3]. Both of these filings separately generated credits and offsets against the 1995 tax liability as originally reported by Plaintiff. Also, Plaintiff's 1996 individual income tax return showed a refund due which constitutes a third source of offsets against Plaintiff's 1995 tax liability. A reading of [Defendant's] paragraphs 42 and 43 ..., when read separated [sic], appear to contradict each other. Also, they do not clearly indicate that Mr. Kanterman is giving subtotals in the process of determining Mr. Robert's 1995 tax liability after application of all credits and offsets generated by his 1996 losses. To recap, there were three sources of credits and offsets for use to decrease the 1995 tax liability generated by Mr. Roberts' 1996 individual income tax return: (a) January 1997 form 1045 tentative carryback application, (b) April 1997 form 1045 tentative carryback application and (c) the tax refund reported on the 1996 return itself (as originally filed in January 1997 and amended in April of 1997). Although not stated (which leads to confusion), paragraph 42 of Defendant's Statement of Material Facts is a recitation by Mr. Kanterman of a subtotal of his calculation of the amount due by Mr. Roberts for his 1995 tax year after application of the credits and offsets made available by the first named source of said credits and offsets: i.e., the January 1997 form 1045 tentative carryback application. This is just one of three sources for credits and offsets against Mr. Robert's 1995 tax liability. Paragraph 43 of Defendant's Statement of Material Facts is again a recitation by Mr. Kanterman of a second subtotal of his calculation of the amount due by Mr. Roberts for his 1995 tax return after application of both the first *1144 and second named sources of said credits: i.e., both the January and April 1997 form 1045 tentative carryback applications. Paragraphs 42 and 43 do not clearly indicated [sic] their status as merely subtotals, not final tabulations. Paragraph 46 of Defendant's Statement of Material Facts gives Kanterman's final calculation of Roberts' 1995 tax liability after application of the three sources of offsets and credits generated by Roberts' 1996 tax losses: $61,682.00.
Plaintiff's Response to Defendant's Statement of Material Facts § 42-43.
By letter dated April 4, 1997, the IRS notified Plaintiff that he had not complied with the terms of the OIC, and "therefore your offer is declared in default and the arrangements to compromise the liability are terminated." In April of 1997, Plaintiff filed an amended 1996 federal income tax return (Form 1040X) and an amended Application for Tentative Refund (form 1045) to carry back an additional net operating loss of $99,481 from 1996 to the 1995 taxable year. Even after Plaintiff's amended 1996 tax return and Application for Tentative Refund were filed with the IRS in April of 1997, Plaintiff remained indebted for unpaid 1995 federal income taxes (according to Kanterman) in the amount of $61,682. To pay this amount, Kanterman sent the IRS in Kansas City, Missouri a check drawn on the account of Commercial Development Co. in the amount of $65,000 to be applied to Plaintiff's 1995 federal income tax liabilities. The letter accompanying the check stated, in pertinent part:
Enclosed is the estimated balance due on the above-named taxpayer's 1995 tax filing after carrybacks of 1996 net operating losses. If the amount due the [IRS] is different than the amount estimated, please contact me and we will provide an additional check.
On the same day that Kanterman sent the $65,000 check to the IRS, he mailed another letter to the IRS in Kansas City which stated, in pertinent part:
We received a communication last month from your office that the taxpayers [sic] Offer in Compromise would be revoked as a result of having unpaid 1995 tax. We responded by calling the indicated person requesting the remaining balance due after the carryback claim [for the 1996 tax year]. I was told that this amount was unknown.
We are forwarding today to the Kansas City Service Center our estimate of the remaining tax due in 1995 for the taxpayer $65,000. Any amount that remains we will pay when you contact us.
We request that you reconsider the revocation of the taxpayers [sic] previous offer based on our effort to determine the net tax due through the Service and the taxpayers [sic] obvious attempt to comply with all required tax payments.

D. THE IRS DECLARES THE OIC TO BE IN DEFAULT ON APRIL 4, 1997.
Three months after Plaintiff filed his 1995 Form 1040 showing an unpaid income tax liability of $246,254, and two weeks after he filed his 1996 Form 1040 tax return and Application for Tentative Refund (form 1045) which carried back a NOL from 1996 to the 1993-1995 tax years, the IRS sent him a letter dated January 21, 1997 which demanded that he pay his reported 1995 income tax liability within thirty days. The letter stated, in pertinent part:
When your Offer in Compromise was accepted, you agreed to comply with all provisions of the Internal Revenue Code relating to the filing and paying of required taxes due for five years from the date we accepted the offer.
*1145 However, a review of your account indicates the following:
Our records show that you have a balance owing for the tax period ending December 31, 1995. To remain in compliance with offer, you must pay the balance within 30 days of the date of this letter. The balance owed, with penalty and interest computed to February 10, 1997, is $2777,143.512.
If you do not comply with our request, we will refer your offer to the Missouri District Office for possible termination of the Offer in Compromise and reinstatement of the original tax liability.
The "contact person" on the January 21, 1997 letter described above was Clara Jacobs. The figure of $2777,143.512, as set forth in the January 21, 1997 letter was erroneous. Plaintiff was not indebted to the United States for unpaid 1995 federal income tax (and statutory additions to tax) in the amount of $2777,143.512 on January 21, 1997. On April 4, 1997, six days before Plaintiff's representatives sent a $65,000 check to the IRS to pay off the balance of his 1995 federal income tax liabilities, the IRS sent Roberts a letter which declared his OIC to be in default and terminated the arrangements previously made to compromise his 1989-1993 federal income tax liabilities and his TFRP. The April 4, 1997 letter stated, in pertinent part:
This refers to our letter of September 28, 1994 accepting your offer of $30,000 in compromise of your Individual Income Tax liability plus statutory additions for December 31, 1989, 1990, 1991, 1992, and Trust Fund Recovery Penalty as a responsible person of Roberts Disposal, Inc. for the period ended December 31, 1989.
Under the terms of your offer $30,000 was to be paid within sixty (60) days of acceptance. On November 28, 1994, $30,000 was paid as agreed but as part of the consideration for the offer you agreed to comply with all the provisions of the Internal Revenue Code relating to the filing of returns and the paying of taxes for a period of five (5) years following acceptance of the offer. As a conditional consideration of the offer, you agreed to waive any net capital losses for which you would be entitled personally for all taxable years after 1993.
Our records indicate that you have now incurred a delinquent liability for your 1995 individual income tax. You have also filed Form 1045, Application for Tentative Refund to carry back capital losses to years 1993, 1994 and 1995.
You have not complied with the terms of the offer, therefore your offer is declared in default and the arrangements to compromise the liability are terminated. All payments made toward the offer will be applied to the liability.
The letter dated April 4, 1997 erroneously stated or implied that Plaintiff had improperly filed Form 1045, Application for Tentative Refund, to carry back capital losses to years 1993, 1994, and 1995, when in fact he had filed the Form 1045 to carry back a net operating loss from the 1996 taxable year to the 1993-1995 tax years. After the OIC was declared in default, the IRS reassessed the amounts of the federal income taxes which Plaintiff (through his authorized representative, Lohbeck) agreed that he owed for 1989 through 1993, together with the TFRP.

E. EVENTS FOLLOWING THE DECLARATION OF DEFAULT BY THE IRS.
On May 19, 1997, approximately six weeks after the IRS declared Plaintiff's OIC to be in default, CPA Arthur M. Seltzer, a colleague of CPA Kanterman at the accounting firm of Brown, Smith and Wallace, submitted a sworn "Application for Taxpayer Assistance Order (ATAO)" to the IRS on behalf of the Plaintiff, their client. Attached to the ATAO was a narrative *1146 "Description of Significant Hardship" prepared by Seltzer. The ATAO stated, in pertinent part:
As the taxpayer's accountant and preparer of his 1995 and 1996 returns, colleague Ronald J. Kanterman, CPA was aware that the taxpayer's inability to pay the 1995 taxes in a timely fashion constituted a technical breach of the terms of the 1994 Offer, and might well result in an effort by the IRS to rescind the Offer and attempt to collect the compromised taxes. He was aware that the unpaid balance due for 1995 would be substantially, if not completely, offset by the carryback of 1996 losses. He therefore directed his efforts to minimizing the economic impact of the breach by arranging for prompt filing of the taxpayer's 1996 return and related carryback claim, and full payment of the 1995 tax liability as promptly as possible....
On April 4, 1997, the taxpayer received a letter form [sic] the Service Center ... advising that, because of the delinquent liability for 1995 and because of a purported breach of the terms of the Offer, the Service has declared in default ....
We suggest that, although the Service has the right to rescind the Offer because of the technical breach committed by the taxpayer in failing to pay his 1995 taxes in full in [sic] timely fashion, rescission is not mandated but is optional with the Service. We believe that if the Service successfully persists in sustaining the rescission of the Offer, unwarranted injury totally disproportionate to the extent of the offense would be sustained by a taxpayer who has acted in good faith in a difficult situation, and in fact at this time has overpaid his 1995 taxes.
On July 30, 1998, Plaintiff filed administrative claims for refund with the IRS with respect to certain federal income taxes, penalties and interest allegedly paid by him for the 1989-1993 taxable years following the termination of the OIC on April 4, 1997. Plaintiff also filed an administrative claim for refund with respect to that portion of the TFRP which he allegedly paid following the termination of the OIC on April 4, 1997. Plaintiff commenced the instant civil action in this Court on March 26, 1999.

II. SUMMARY JUDGMENT STANDARDS.
The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to `secure the just, speedy and inexpensive determination of every action.'" Id. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).
In order to obtain summary judgment, the moving party must demonstrate "an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party carries this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party may not rest on allegations or denials in the pleadings, but must "come forward with `specific facts showing that there is a genuine issue for trial.'" Id. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(3)).
*1147 In analyzing summary judgment motions, the Court is required to view the facts in a light most favorable to the nonmoving party, and must give the non-moving party the benefit of any inferences that can logically be drawn from those facts. Matsushita, 475 U.S. at 587, 106 S.Ct. 1348; Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). Moreover, this Court is required to resolve all conflicts in favor of the non-moving party. Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). The trial court may not consider the credibility of the witnesses or the weight of the evidence. White v. Pence, 961 F.2d 776, 779 (8th Cir.1992).
Under the standards applicable to summary judgment motions, before ruling on the legal issues presented, the Court must find that there are no genuine issues of material fact. See Celotex Corp., 477 U.S. at 322, 106 S.Ct. 2548.
[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
Id. at 322-23, 106 S.Ct. 2548. "By its very terms, [Rule 56(c)(1)] provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Hufsmith v. Weaver, 817 F.2d 455, 460 n. 7 (8th Cir.1987) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis supplied by Supreme Court)). Material facts are "those `that might affect the outcome of the suit under the governing law ....'" Id. "`While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.'" Id. Rule 56 requires also that the material fact be genuine. Id. A genuine material fact is one such that "`a reasonable jury could return a verdict for the nonmoving party.'" Id.

III. ANALYSIS.
The Plaintiff states, in his Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, that "[t]his entire case turns upon the propriety of the IRS's termination of the OIC under contract law." Plaintiff's Memorandum in Opposition at 7. The ground upon which the IRS terminated the OIC and declared Plaintiff in default is "a delinquent liability for [his] 1995 individual income tax." Id. Plaintiff argues that his failure to pay his 1995 income tax on time was at most an immaterial breach of the OIC, and, as such, the IRS wrongfully declared him in default of the OIC, terminated the OIC, and began the process of collecting all taxes, plus penalties, originally owed by Plaintiff.
"It has long been settled that an agreement compromising unpaid taxes is a contract and, consequently, that it is governed by the rules applicable to contracts generally. The cardinal rule of contract construction `is to ascertain the intention of the contracting parties and to give effect to that intention if it can be done consistently with legal principles.'" United *1148 States v. Lane, 303 F.2d 1, 4 (5th Cir.1962) (citations omitted). The Government, based on the Court's review of the undisputed facts in this case and the relevant precedent, had the right to terminate the OIC based on Plaintiff's failure to pay his 1995 taxes until April 10, 1997. Federal income taxes are due, and constitute a liability as of, the date the tax return is required to be filed. See United States v. Ressler, 433 F.Supp. 459, 463 (S.D.Fla. 1977) ("Regardless of when federal taxes are actually assessed, taxes are considered as due and owing, and constitute a liability, as of date the tax return for the particular period is required to be filed.") (citing Hartman v. Lauchli, 238 F.2d 881, 887 (8th Cir.1956) ("by the terms of the Internal Revenue Code income tax liability matures on the day the return is required to be filed, and the correct amount of the tax liability becomes due at that time, regardless of when the deficiency assessment may be made ...."), cert. denied, 353 U.S. 965, 77 S.Ct. 1048, 1 L.Ed.2d 915 (1957)). This means that Plaintiff breached his obligation to pay his federal income taxes in 1995 when he failed to pay them by April 15, 1996. See Ott v. United States, 141 F.3d 1306, 1309 (9th Cir.1998) (in a case involving the non-payment of estate taxes owed, the Ninth Circuit stated "The Tax Code provides: `when a return of tax is required under this title or regulations, the person required to make such return shall, without assessment or notice and demand from the Secretary ... pay such tax at the time and place fixed for filing the return (determined without regard to any extension of time for filing the return).'") (quoting 26 U.S.C. § 6151(a)). According to the specific terms of the OIC, entered into by the Government and the Plaintiff, Plaintiff promised to "comply with all provisions of the Internal Revenue Code relating to filing my[] returns and paying my[] required taxes for five (5) years from the date the IRS accepts the offer." When Plaintiff failed to pay his 1995 federal income tax liability of $246,354.00 when it became due, he violated this provision of the OIC, authorizing the Government to declare Plaintiff in default of the express terms of the OIC and "file suit or levy to collect the original amount of tax liability, without further notice of any kind." See Statement of Facts, supra at 6 (quoting Offer in Compromise at ¶ (o)). The right of the Government to terminate the Offer in Compromise where there has been a breach by the taxpayer of its provisions has been upheld in United States v. Feinberg, 372 F.2d 352, 357-58 (3d Cir.1967). The Third Circuit stated that "By the clear language of the offer in compromise Mr. Saladoff agreed that, upon his default, the Commissioner of Internal Revenue could terminate the compromise agreement." Feinberg, 372 F.2d at 357-58. As in Feinberg, the default by the Plaintiff is undisputed. Plaintiff has admitted that he failed to pay his 1995 income taxes until April 10, 1997. Despite Plaintiff's argument that the Government lacked authority to terminate the OIC upon his default of any of the provisions, the OIC specifically empowered the Government to declare him in default and pursue collection of his original tax liability, effectively terminating the OIC.
With respect to Plaintiff's argument that he did not materially breach the OIC, the Court finds this argument unpersuasive. Plaintiff promised and agreed in the OIC that he would abide by the terms of the Internal Revenue Code for the next five years. Failure to abide by this promise allowed the Government to declare him in default and collect his original tax liability. Nothing in the OIC allowed him to delay payment of his 1995 tax liability until April 10, 1997 under the guise of the substantial performance doctrine. While it is true that contract principles guide the Court in interpreting and OIC, this Court is not *1149 persuaded that the Government, in this case, lacked authority to declare Plaintiff in default of the OIC when he failed to timely pay his 1995 income taxes. See Lane, 303 F.2d at 4 (holding that the language of the compromise agreement allowing the Government to terminate the OIC upon default was "so precise, and the intention which it manifests is so evident, as to leave no doubt that the course of action taken by Government here was fully authorized by the compromise agreement."). The doctrine of substantial performance has no relevance in this case as the Plaintiff completely failed to timely pay his 1995 federal income tax liability, and instead waited to pay it until April 10, 1997 so that he could offset his tax liability for 1995 with his losses in 1996.
Finally, with respect to Plaintiff's argument that the Government's termination of the OIC will cause him to suffer a forfeiture, the Court finds United States v. Lane on point.
There was nothing illegal, immoral or inequitable in the compromise agreement. It did not provide for any "forfeiture". By express provision, the amounts to be paid under the compromise agreement, including both the Form 656-C and the collateral agreement, could not exceed the aggregate amount which the taxpayer conceded that he owed the Government from the start. By allowing the Government to revive the taxpayer's original liability, the taxpayer will not forfeit the amounts he has already paid, for those amounts will be applied to reduce the original liability. The agreement was precise, it was fair, and it was freely consented to by the taxpayer. There is no reason why it should not be enforced as written.
Lane, 303 F.2d at 4. The Court finds Plaintiff's argument that he will suffer a forfeiture if the OIC is enforced as written is without merit.
Accordingly,
IT IS HEREBY ORDERED that Defendant's Motion to Dismiss and Motion for Summary Judgment [doc. #46] are GRANTED.
NOTES
[1] Refers to tax assessed per tax return
(2) Refers to the late tax return filing penalty
(3) Refers to the late payment of tax penalty
(4) Refers to the statutory interest
(5) Refers to the additional tax assessed after IRS examination
(6) Refers to the underpayment of estimated tax penalty
[2] At this point in Defendant's statement of material facts, Defendant details certain facts concerning a residence purchased by Michael Roberts that was transferred to his brother's company. However, Plaintiff objects to the inclusion of these facts as immaterial because they are not mentioned nor referred to in the argument portion of Defendant's briefs. The Court therefore will not include these facts in the Court's statement of facts as they appear not to be material to the issues involved in Defendant's Motion for Summary Judgment.
[3] IRC § 172, as in effect in 1996, required carryback of NOLs 3 years. It has since been amended to require NOL carrybacks of 2 years.